[Civ. No. 48599. First Dist., Div. Two. June 12, 1980.]

FOUNDATION FOR SAN FRANCISCO'S ARCHITECTURAL
HERITAGE et al., Plaintiffs and Appellants, v.
CITY AND COUNTY OF SAN FRANCISCO et al.,
Defendants and Respondents;
NEIMAN-MARCUS, Real Party in Interest and Respondent.

894

896

**COUNSEL**

Antonio Rossmann for Plaintiffs and Appellants.

Hanson, Bridgett, Marcus, Vlahos & Stromberg, Stephen L. Taber and Stephen N. Dennis as Amici Curiae on behalf of Plaintiffs and Appellants.

George Agnost, City Attorney, and Philip J. Moscone, Deputy City Attorney, for Defendants and Respondents.

Jacobs, Sills & Coblentz, William F. McCabe, Jonathan R. Bass, Pamela S. Duffy, O'Melveny & Myers, Henry C. Thumann, James W. Colbert III, Lisa Hill Fenning and Willie L. Brown for Real Party in Interest and Respondent.

## OPINION

**TAYLOR, P. J.**—Foundation for San Francisco's Architectural Heritage, et al.[1] (collectively Foundation) appeal from the denial of their petition for a writ of administrative mandamus to overturn the approval by the Board of Permit Appeals (Board) of the City and County of San Francisco (City) of permits for the demolition of the City of Paris building and the construction of a new building by the real party in interest, Neiman-Marcus, a division of Carter-Hawley-Hale Stores, Inc. The Foundation's major contentions are that: 1) the environmental impact report (EIR) did not comply with the procedural requirements of the California Environmental Quality Act (CEQA); 2) the Board's approval violated the substantive mandate of CEQA and the Board's findings did not comply with Public Resources Code section 21081; and 3) the City's master plan provided an independent basis for historic preservation. For the reasons set forth below, we have concluded that there is no merit to any of these contentions and that the judgment must be affirmed.

A detailed chronology of the pertinent facts, as revealed by the record, is as follows: As this litigation focuses on the demolition of the City of Paris building, we begin there. The City of Paris department store, which originated aboard a ship in San Francisco Bay in 1850, by 1896 occupied the Spring Valley Water Company building. The Spring Valley building was designed by architect, Clinton Day, whose works included the Stanford Memorial Church. By 1978, the City of Paris building and the Union Trust Company, at Grant Avenue and Market Street designed in 1908, were the only Day-designed buildings in the City. After the 1906 earthquake, the Spring Valley building required complete interior structural reconstruction. John Bakewell and Arthur Brown, Jr., assisted by Louis Bourgeois, were commissioned to design the building interior. Bakewell and Brown graduated from the University of California in the 1890's and attended the School of Beaux Arts in Paris; Bakewell was a student of Bernard Maybeck. Bakewell and

---

[1]The National Trust for Historic Preservation appeared as amicus for appellants.

Brown designed a number of neoclassic buildings, including the City Hall and the Veterans' War Memorial Building.

The interior redesign included enlarging an existing rotunda into an elliptical shape extending through four floors, and crowned with a skylight and art glass dome. The rotunda is supported on the ground floor by eight pillars ornamented with masks of women's faces wreathed with grape leaves and grape clusters. From the ground floor, giant, fluted pilasters with Corinthian capitals rise the full length of the space. The art glass dome caps the rotunda with white and amber glass, with a faint trace of light green, depicting a sailing ship, the emblem of Paris, France, against a background of fleurs-de-lys. Following the reconstruction of the City of Paris building in 1909, the store annually erected a Christmas tree which rose from the main floor into the upper reaches of the rotunda. For many Bay Area residents, no Christmas season was complete without viewing "the tree."

The City of Paris occupied the building from 1909 until it closed in 1967. The building was temporarily occupied by Liberty House from May 1972 to October 1974, and partially by a discount outlet of Joseph Magnin. The building has been vacant ever since.

Neiman-Marcus acquired the City of Paris building in 1970 and the adjacent premises at 133-157 Geary Street in 1971. When Neiman-Marcus in 1974 announced plans to demolish the City of Paris building to erect a branch of its specialty store, there was widespread opposition, including a petition drive which obtained thousands of signatures to preserve the building. The matter had been under discussion before the City's Landmarks Preservation Advisory Board since 1970.

In January 1974, one of the appellants petitioned the board of supervisors and the director of planning urging that the building be designated a City landmark. The City's Landmarks Preservation Advisory Board conducted a study and recommended landmark status for the building because of its special character, special historical architectural and aesthetic interest and value, and because the proposed designation would be in conformance with article 10 of the City Planning Code.

A public hearing held by the City Planning Commission (Planning Commission) on July 11, 1974, attracted representatives of a number of

local organizations who pressed for landmark designation. Stanley Marcus, of Neiman-Marcus, stated that the building did not meet the firm's space and safety standards; he proposed to incorporate the rotunda and dome into the new structure, and to continue the Christmas tree tradition.

Allan Jacobs, then director of planning, stated that most of the comments at the landmarks board hearing had addressed the building's interior, and pointed out that landmark designation applies to the exterior of a building and offers no protection for the interior. The City Planning Commission adopted resolution No. 7212, disapproving City landmark status for the reasons set forth below.[2] The decision was appealed to the City's board of supervisors, which after four public hearings refused to designate the City of Paris as a landmark. Subsequently, the building was designated a State Historical Landmark and also was placed on the National Register of Historical Places at the National Level of Significance.

In December 1977, the consultant employed by Neiman-Marcus, submitted a preliminary draft of the EIR. After almost 10 months of review and revision by the department of city planning (Department) the City released its draft EIR in October 1978. Subsequently, the Planning Commission held public hearings, and prepared 130 pages of detailed comments and revisions. The draft EIR indicates that the Foundation and other opponents had an opportunity to comment and testify. A public hearing on the final EIR was held in December 1978,

---

[2]"The City of Paris store, which occupied the subject site from 1896 to 1972, and played an important role in the downtown retail life of San Francisco, no longer exists; and

"The commission believes that the *use of the site for a major retail activity is of utmost importance to the vitality of the downtown retail area*; and

"There is *strong evidence that the existing building on the site is structurally unsound and presents a major potential hazard* in the case of a major earthquake to the numerous shoppers in the Union Square area, and *abatement of this safety hazard* by strengthening the existing structure *would be extremely* costly; and

"The owner of the building has stated his intention to raze the existing building, and replace it with a major retail store visually in keeping with the surrounding area; and

"The *Commission does not believe the exterior* of the City of Paris building *is architecturally unique nor meritorious*, and if designated as a Landmark only the exterior of the building would be controlled by the provisions of Article 10 of the City Planning Code; and

"The *Commission notes that the rotunda*, skylight and large open space concept of the interior of the building *is architecturally unique and should be preserved if possible, and the owner of the property has stated his intention to reproduce a similar open space within the proposed retail store....*" (Italics added.)

the EIR certified, and the Planning Commission adopted resolution No. 8134.

The final EIR indicated that the physical condition of the building created a number of impediments to the retail store use intended by Neiman-Marcus, including low ceiling heights, lack of escalators, and inefficient division of space. The design of the building preceded modern lighting and climate control. The building also did not have a modern fire sprinkler system and did not meet the current seismic safety requirements of the City building code. Because of the structural and seismic weaknesses, attempts to rehabilitate the building and conform it to code requirements would be expensive and time-consuming and without guarantee of success. The proposed new building will retain the rotunda and glass dome; it was designed by two of the country's most prominent architects, Phillip Johnson and John Burgee. Beneficial economic impacts include 550 new jobs and additional City revenues of about $1,052,900 and almost $2 million in tax revenues to the state.

In January 1979, after a public hearing, the Planning Commission drafted its resolution No. 8150; after another public hearing in March 1979, the permits were issued. The Foundation appeared at all of these proceedings and then appealed to the Board.

On September 12, 1979, the Board held a duly noticed public hearing to consider the Foundation's appeals Nos. 8608, 8609 and 8610, protesting the issuance of permits Nos. 451141, 451281, and 451282, which allowed the demolition of the City of Paris building and construction of a new Neiman-Marcus specialty retail store on the site commonly known as 133-181 Geary Street (the Project). The parties and other interested citizens appeared at this hearing. At the conclusion of the hearing, the Board, by a three to one vote,[3] adopted a resolution stating that: 1) the Board had reviewed and considered the final EIR certified by the Planning Commission's resolution No. 8134 as in compliance with CEQA and the applicable California guidelines; 2) the Board reviewed and considered resolution No. 8134 adopted by the Planning Commission on December 21, 1978, and resolution No. 8150 adopted by the Planning Commission on January 11, 1979, as well as the testimony presented at the public hearing and the written materials submitted.

---

[3]One of the five members of the Board had recused himself for a conflict of interest; only four were eligible to vote.

The Board found that the considerations and findings contained in the Planning Commission's above resolutions were valid and appropriate under the circumstances, and confirmed both of these resolutions in their entirety.[4]

---

[4]The pertinent portions of each resolution may be summarized as follows in chronological order:

Planning Commission Resolution *No. 8134* (adopted Dec. 21, 1978): A *draft environmental* impact report, *dated October 13, 1978, has been prepared* by the Department in connection with EE77.257, demolition of the City of Paris building and construction of a Neiman-Marcus department store on the property. The Department duly filed a notice of completion of the draft report with the secretary of the California Resources Agency, gave other notice, and requested comments as required by law, made the report available to the general public, and satisfied other procedural requirements and held a duly advertised public hearing on the draft on November 14, 1978, at which time opportunity was given for public participation and comments.

*A final EIR, dated December 21, 1978*, was prepared by the Department, based upon the EIR, any consultations and comments received during the review process, any additional information that became available, and a response to any comments that raised significant points concerning effects on the environment.

On December 21, 1978, the Planning Commission reviewed the final EIR and *found that its contents and the procedures through which it was prepared, publicized and reviewed complied with CEQA.*

The Project described would result in demolition of the City of Paris building, which is considered by many to have potential for restoration and use, which has *not* been named a San Francisco landmark, *but was designated State Historic Landmark No. 875 on January 13, 1975, and was placed on the National Register of Historic Places on January 23, 1975, and the Planning Commission believes that demolition of said building will have a significant effect on the environment.*

The Project *would result in a new building whose design would conflict with some policies and objectives* of the urban design element of the San Francisco Comprehensive Plan, and the *Planning Commission believes that the proposed design would have a significant urban design and visual effect on the local environment.*

The Planning Commission found that the final EIR, dated December 21, 1978, is adequate, accurate and objective and certified completion of the report in compliance with CEQA. In doing so, the Planning Commission found that *the Project, as proposed, would have a significant historic, visual and urban design effect on the environment of Union Square.*

Planning Commission Resolution *No. 8150* (adopted Jan. 11, 1979): The staff of the Department had met with the architect of the Project on five separate occasions and informed the architect of applicable local planning and zoning provisions of the master plan and planning code. A great many contacts to provide information, respond to questions and generally accommodate the needs of the applicant and interested parties had occurred between the staff and the applicant's representatives and the interested public. The proposed building would incorporate the rotunda and dome of the City of Paris building in the new building.

Before acting on the building permit, the Planning Commission reviewed and considered the information in the EIR and found that *the following considerations override the significant historic effects on the environment*:

1. The *City determined, in a series of actions in 1974*, including Planning Commission Resolution No. 7212, *that the existing City of Paris building did not merit designation as a City landmark*, for reasons which included: the fact that the City of

The Board further found that: "2. *The conditions imposed by the City Planning Commission on the permits constitute major mitigation of the significant visual and urban design impacts of the project, including the historic impacts*, as follows:

"A. *The conditions preserve the unique architectural and historic features of the City of Paris Building, the rotunda and the dome*;

"B. The *facade and fenestration* requirements *keep the project within the scale and architectural characteristics* of the surrounding buildings and environment;

"C. The *retention of the dome preserves the association* of the site with the historic, but now defunct, City of Paris Department Store.

---

Paris store no longer exists, that the owner of the building has stated an intention to replace it with a major retail store visually in keeping with the surrounding area, that the exterior of the existing building is not architecturally unique or meritorious, and that the owner has stated its intention to preserve the dome and rotunda.

2. *The final EIR indicates that revenues to the owner from the proposed project and potential resulting sales and payroll tax revenue to the City initially would be 18 to 100 percent higher than the revenues estimated to be produced by the alternatives discussed* in the final EIR for reuse of the existing building, *and this difference could become greater over time if the alternative failed to meet the Project sponsor's merchandising needs.*

3. *Neiman-Marcus has indicated that alternative proposals that would involve use of the existing building would be infeasible from a merchandising standpoint.*

4. *The final EIR indicates that alternatives that would involve Neiman-Marcus' use* of the existing building, assuming one was feasible for Neiman-Marcus' use, *would cause delays of up to nine months in construction initiation and one year or more in opening a retail specialty store, over and above the time predicted for implementation of the present proposal, with accompanying losses of employment and City revenues.*

5. *Use of the existing building by another developer, if another developer could purchase and use the site, would increase uncertainty as to a schedule of construction with* possible delays in the site's contribution to *the City's retail trade,* and potential resulting losses in City revenues, in employment and *in economic multiplier effects from the new jobs and commercial activity proposed by the Project sponsor in downtown San Francisco.*

6. *The proposed Project would provide about 150 new construction jobs and 350 to 450 permanent jobs.*
The Commission further found that the significant visual and urban design impacts would be mitigated or substantially lessened by the conditions that are made part of this action pertaining to architectural design, pedestrian/vehicular circulation and landscaping.

"3. *No feasible alternative to the project was presented before the City Planning Commission, nor does one exist, because*:

"A. The *developer cannot use the City of Paris Building in its present configuration or in any rehabilitated or renovated configuration* as a retail specialty store *because the interior space available does not meet the developer's marketing requirements*;

"B. *The use of the existing structure in an unrehabilitated configuration is not desirable because the structure does not presently meet the minimum building code requirements with regard to seismic safety*;

"C. *Any attempted rehabilitation of the present structure to meet minimum safety requirements would result in substantially greater construction costs than the proposed project*;

"D. There is *no guarantee that rehabilitation of the building sufficient to meet minimum seismic safety requirements would preserve* the facade and other structural elements in the event of an earthquake;

"E. *Any alternative* which contemplated rehabilitation of the existing structure *would entail substantial delay* in construction *with resultant higher construction costs, and substantial deferment and reduction* of sales revenues and tax revenues *to the City and County of San Francisco*;

"F. *Any alternative which contemplated use of the existing structure would result in lower annual sales revenues, lower tax revenues and a reduction in the economic multiplier* effect which would result *from the project*;

"G. *The use of the existing site by any other developer would present that developer with substantially the same rehabilitation costs as would be faced by Neiman-Marcus*;

"H. *Neiman-Marcus has advised the Board that it is unwilling, at present, to sell the site to any other developer and the City cannot force such a sale*;

"I. *There is no evidence that another developer exists who is willing to acquire and rehabilitate the existing structure and who has the financial and technical ability to do so*;

"J. *Use of the existing building by another developer*, if another developer could purchase and use the site *would increase uncertainty as to a schedule of construction* with possible delays in the site's contribution to San Francisco's retail trade, *and potential resulting losses in City revenues*, in employment and in economic multiplier effects from the new jobs and commercial activity proposed by project sponsor in downtown San Francisco.

"4. *No alternative to the project is capable of being accomplished in a successful manner within a reasonable period of time*, taking into account economic, environmental, social and technological factors." (Italics added.)

The Board concluded that "*The benefits of the project*, including increased tax revenues, new employment opportunities, economic multiplier effects, and the establishment of a specialty retail store in accordance with the Master Plan, *override the significant environmental and urban design effects, including the historic effects* (to the extent they have not been mitigated as outlined above), *and any further mitigation measures which would eliminate, delay, or reduce those benefits are not feasible.*" (Italics added.)

The Foundation filed its petition for a writ of mandamus in February 1979. After a hearing, the court entered its judgment that the Board's decision was supported by substantial evidence and that the Board had proceeded in a manner required by law, pursuant to Public Resources Code sections 21168[5] and 21168.5,[6] and Code of Civil Procedure section 1094.5. This appeal ensued. This court acceded to the parties' joint re-

---

[5]The statute provides: "Any action or proceeding to attack, review, set aside, void or annul a determination, finding, or decision of a public agency, made as a result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in a public agency, on the grounds of noncompliance with the provisions of this division shall be in accordance with the provisions of Section 1094.5 of the Code of Civil Procedure.

"In any such action, *the court shall not exercise its independent judgment on the evidence but shall only determine whether the act or decision is supported by substantial evidence* in the light of the whole record." (Italics added.)

[6]The statute provides: "In any action or proceeding, other than an action or proceeding under Section 21168, to attack, review, set aside, void or annul a determination, finding, or decision of a public agency on the grounds of noncompliance with this division, the inquiry shall extend *only to whether there was a prejudicial abuse of discretion.* Abuse of discretion *is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.*" (Italics added.)

quest for an expedited hearing, pursuant to Public Resources Code section 21167.1.[7]

Preliminarily, we dispose of the Foundation's minor procedural contentions.

■ Foundation argues that the Board could not make and add findings by a vote of three to one. For this proposition, Foundation relies on section 3.651 of the City Charter (Charter)[8] which delineates the functions, powers and duties of the Board.

In the exercise of its appellate jurisdiction, the Board is invested with complete power to hear and determine the entire controversy before it, is free to draw its own conclusions from the conflicting evidence before it, and in the exercise of its independent judgment in the matter, to affirm, modify or overrule the action of the subordinate agency or official at the primary level. When exercising its review powers, the Board is bound by the relevant law as enunciated by the Charter, ordinances and controlling court decisions, and it must exercise a lawful discretion applied to the facts in evidence (*City & County of S. F.* v. *Superior Court* (1959) 53 Cal.2d 236, 250-251 [1 Cal.Rptr. 158, 347 P.2d 294]). The Board's discretion embraces broad factfinding powers in the exercise of its independent judgment (*City and County of San Francisco* v. *Pace* (1976) 60 Cal.App.3d 906, 910 [132 Cal.Rptr. 151]).

So far as here pertinent, Charter section 3.651 provides: "After such hearing and such further investigation as the board may deem necessary, it may concur in the action of the department authorized to issue such license or permit, or, by the vote of four members, may overrule the action of such department and order that the permit or license be granted, restored or refused."

The Charter specifies only that the votes of four members are required to *overrule* the action of the agency in issue. As no specific number of votes is specified for a concurrence or affirmance, any power not expressly forbidden by the Charter may be exercised by the municipality (*Lindell Co.* v. *Board of Permit Appeals* (1943) 23 Cal.2d 303,

---

[7]This section, added by Statutes of 1976, chapter 1312, section 19, provides for preference "over all other civil actions."

[8]We may take judicial notice of the City Charter provisions (Evid. Code, §§ 452, subd. (b), 459; *City and County of San Francisco* v. *Pacello* (1978) 85 Cal.App.3d 637, 642, fn. 1 [149 Cal.Rptr. 705]).

310 [144 P.2d 4]). Thus, the reasonable construction of the provision is that only a majority vote is required for a concurrence or affirmance. Here, there was such a concurrence by a vote of three, a clear majority of the four members of the Board who were qualified to act on the matter. We conclude that the Board was empowered to make additional findings by majority vote.

The Foundation also maintains that the trial court was required to make findings and conclusions. ■ In administrative mandamus proceedings in which the trial court is required to exercise a substantial evidence rather than an independent judgment review of the proceedings, findings of fact are not required (*Sierra Club* v. *California Coastal Zone Conservation Com.* (1976) 58 Cal.App.3d 149, 156 [129 Cal.Rptr. 743]; *Friends of Lake Arrowhead* v. *Board of Supervisors* (1974) 38 Cal.App.3d 497, 518 [113 Cal.Rptr. 539]).

■ We turn first to the Foundation's contention that the EIR was inadequate as: 1) it was based only on data supplied by Neiman-Marcus; and 2) it did not properly discuss the alternatives.

"'[A] "major purpose of an EIR is to inform other government agencies, and the public generally, of the environmental impact of a proposed project [citations]...." (*No Oil, Inc.* v. *City of Los Angeles* [1974] 13 Cal.3d 68, 86) and to inform the decision-making agency of the full range of adverse environmental effects and alternative measures prior to its decision to approve or disapprove such project (former § 21061; Guidelines, §§ 15012, 15150), the underlying policy of the act to "[e]nsure that the long-term protection of the environment shall be the guiding criterion in public decision" (§ 21001, subd. (d)), dictates that the "initial and primary responsibility for striking [the necessary] balance between competing concerns must rest with the [decision-making] agency itself,..." [citations] and whose consideration cannot be merely a "post hoc rationalization" of a decision already made. [Citations.]' (*Mount Sutro Defense Committee* v. *Regents of University of California* (1978) 77 Cal.App.3d 20, 36-37 [143 Cal.Rptr. 365].)" (*Residents Ad Hoc Stadium Com.* v. *Board of Trustees* (1979) 89 Cal. App.3d 274, 284 [152 Cal.Rptr. 585].)

"CEQA assumes as inevitable an institutional bias within an agency proposing a project and provides the procedural requirements (§§ 21000 and 21100) to insure that the decision-maker does not fail to note the

facts and understand the serious arguments advanced by the opponents to the EIR." (*Residents Ad Hoc, supra*, p. 285.)

The record does not support the Foundation's contentions concerning the alleged partiality of the EIR and the City's unlawful delegation of its review functions to Neiman-Marcus. As indicated in the detailed chronology set forth above, both before and after preparation of the draft EIR, there was ample opportunity for the input and comment of all persons interested. On the basis of these, significant additions and revisions were made to the final EIR.

The EIR is not fatally undermined by the direct participation of the developer and his experts in the underlying environmental and other studies. As the public agency must, of necessity, work closely with the permit applicant, CEQA does not prohibit the applicant from providing the data, information and reports required for the preparation of the EIR. CEQA merely requires that the agency independently perform its reviewing, analytical and judgment functions and to participate actively and significantly in the preparation and drafting process (cf. *Sierra Club* v. *Lynn* (5th Cir. 1974) 502 F.2d 43, 59). The City did no less here.

""""[I]t is doubtful that any agency, however objective, however sincere, however well-staffed, and however well-financed, could come up with a perfect environmental impact statement in connection with any major project. Further studies, evaluations and analyses by experts are almost certain to reveal inadequacies or deficiencies. But even such deficiencies and inadequacies, discovered after the fact, can be brought to the attention of the decision-makers, . . . ."" (*Environmental Defense Fund* v. *Corps of Eng., U.S. Army* (8th Cir. 1972) 470 F.2d 289, 297; *City of Boston* v. *Volpe* (1st Cir. 1972) 464 F.2d 254, 257; *Environmental Def. F., Inc.* v. *Corps of Eng. of U.S. Army* (5th Cir. 1974) 492 F.2d 1123, 1129.)" (*Residents Ad Hoc Stadium Com., supra*, 89 Cal. App.3d, at p. 285.)

The record indicates that the Board as well as the Planning Commission were solicitous of public opinion and did not reach their decisions until the conclusion of the public comment periods and the public hearings. Thus, *Woodland Hills Residents Assn., Inc.* v. *City Council* (1980) 26 Cal.3d 938 [164 Cal.Rptr. 255, 609 P.2d 1029], is inapposite, as there the trial court found that Los Angeles (although aware of

the opposition), failed to seek citizen comments in time to influence preparation of the draft EIR (*id.*, at pp. 949-950).

The record indicates that the EIR devotes 39 pages to a detailed discussion of the proposed Citizens Committee and McRee alternatives which involved retention of the City of Paris. The record indicates that at the hearing before the Board, a representative of Carter-Hawley-Hale acknowledged that the alternatives presented differed from the initial ones, as efforts had been made to increase the viability of the original proposals. The Citizens Committee representative told the Board of a single change in his group's proposal and ascribed no negative effects to the change. Although McRee complained of adverse changes in his proposal, no detail was or has been provided. Thus, the record does not support the Foundation's assertion that the two citizens' alternatives were misrepresented.[9]

The Foundation further complains that the EIR concealed another alternative, namely, purchase of the property by a Hawaii developer, Haley Pruyn. This contention is based on a memorandum dated December 7, 1978, of a telephone call from a member of the Planning Commission staff, stating that: "Mr. Specter *did* offer to purchase the City of Paris building, about 1 1/2 to 2 years ago, but he learned that Carter Hawley Hale 'beat him to it.'" The memorandum further stated that if the building required renovation to bring it up to code, he would have to look into "the economics of it" and that "on a scale of 1 to 10," his interest was in the "6 to 7" range. A second memo dated December 13, 1978, explained the contents of the first, i.e., Mr. Specter was in San Francisco and asked a real estate firm about the availability of the City of Paris building. Thus, at best, the record merely indicates that Haley Pruyn only made an investigation into the advisability of making an offer prior to Neiman-Marcus' purchase of the property. Thus, the record does not support the Foundation's contention that the EIR concealed the Haley Pruyn alternative. The EIR thus correctly stated that there were no alternative developers.

■ An EIR must describe all reasonable alternatives to the project (Pub. Resources Code, § 21061), including those capable of reducing or

---

[9]Equally without merit is the contention made for the first time at oral argument that the potential tax incentives for preservation afforded by the Tax Reform Act of 1976 (26 U.S.C. § 191) and the Revenue Act of 1978 were not considered. The record indicates that these were considered but rejected as insignificant in relation to the costs of rehabilitation.

eliminating environmental effects; the specific alternatives of "no project" must also be evaluated (Pub. Resources Code, §§ 21002, 21100; Guidelines, Cal. Admin. Code, tit. 14, § 15143, subd. (d)). (*County of Inyo* v. *City of Los Angeles* (1977) 71 Cal.App.3d 185, 200-203 [139 Cal.Rptr. 396]). The discussion of alternatives need not be exhaustive, and the requirement as to the discussion of alternatives is subject to a construction of reasonableness. The statute does not demand what is not realistically possible, given the limitation of time, energy and funds. "Crystal ball" inquiry is not required.

■ The statutory requirements for consideration of alternatives must be judged against a rule of reason. There is no need for the EIR to consider an alternative whose effect cannot be reasonably ascertained and whose implementation is deemed remote and speculative (cf. *Sierra Club* v. *Lynn, supra*, 502 F.2d, at p. 62, cert. den. *sub. nom. Sierra Club* v. *Hills*, 421 U.S. 994 [44 L.Ed.2d 484, 95 S.Ct. 2001], and *sub nom. Edwards Underground Water District* v. *Hills*, 422 U.S. 1049 [45 L.Ed.2d 701, 95 S.Ct. 2668]). Absolute perfection is not required; what is required is the production of information sufficient to permit a reasonable choice of alternatives so far as environmental aspects are concerned. It is only required that the officials and agencies make an objective, good-faith effort to comply.

Public Resources Code section 21061.1 provides: "'Feasible' means capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." We conclude that the instant EIR in good faith discussed the alternatives.[10]

We note that the Foundation does not challenge the adequacy of the EIR in any other respect. Thus, we can only conclude that the EIR was adequate. We do not pass upon the EIR's environmental conclusions but only upon its sufficiency as an informational document (*County of Inyo* v. *City of Los Angeles, supra*, 71 Cal.App.3d, at p. 189.)

■ Next, we turn to the Foundation's contention that the Board's approval of the Project violated the substantive requirements of CEQA,

---

[10]In view of this conclusion, we need not reach the Foundation's contentions concerning additional time for an impartial analysis of feasible alternatives.

as set forth by Public Resources Code, sections 21002 and 21002.1, set forth, so far as pertinent, below.[11]

Specifically, the Foundation argues that the Board failed to consider other feasible alternatives and feasible mitigation measures.

The Foundation's first argument focuses on the alleged availability of other ready, able and willing developers who would preserve the City of Paris.

Our prior discussion of the Haley Pruyn matter indicates its chimerical nature. The Foundation, however, relies chiefly on Mr. Joseph Weiner, as an alternative developer.

The record indicates that on January 11, 1979, nearly three weeks after the final EIR had been certified, Weiner[12] delivered a letter to Neiman-Marcus offering to buy the City of Paris and 133 Geary Street for $7 million or acquisition and carrying costs, but not including certain overhead and operating costs. As Neiman-Marcus' total costs at that time exceeded $8 million, the offer would have involved a substan-

---

[11]Section 21002: "The Legislature finds and declares that *it is the policy of the state that public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation* measures available *which would substantially lessen the significant environmental effects* of such projects, and that the procedures required by this division are intended to assist public agencies in systematically identifying both the significant effects of proposed projects and the feasible alternatives or feasible mitigation measures which will avoid or substantially lessen such significant effects. The Legislature further finds and declares that *in the event specific economic, social, or other conditions make infeasible such project alternatives or such mitigation measures, individual projects may be approved in spite of one or more significant effects thereof*" (italics added).

Section 21002.1: "In order to achieve the objectives set forth in Section 21002 the Legislature finds and declares that the following policy shall apply to the use of environmental impact reports prepared pursuant to the provisions of this division:

"(a) The *purpose of an environmental impact report is to identify the significant effects* of a project on the environment, *to identify alternatives* to the project, and *to indicate the manner in which such significant effects can be mitigated or avoided.*

"(b) Each public agency *shall mitigate or avoid* the significant effects on the environment of projects it approves or carries out *whenever it is feasible to do so.*

"(c) *In the event that economic, social*, or other conditions make it infeasible to mitigate one or more significant effects of a project on the environment, *such project may nonetheless be approved or carried out at the discretion of a public agency, provided that the project is otherwise permissible* under applicable laws and regulations" (italics added).

[12]Weiner's letter indicated that he was the developer and owner of Firehouse No. 1, and developer and coowner of One Jackson Place in San Francisco.

tial loss to Neiman-Marcus. The record also indicates that Neiman-Marcus was not willing to sell the property.

Even assuming so, we think the Board's failure to consider the Weiner offer as a "feasible alternative" was proper. The record indicates that the Board also found that: 1) the City of Paris did not meet the minimum building code requirements as to seismic safety; 2) any attempted rehabilitation to meet these requirements would result in substantially greater construction costs than the proposed Project; 3) there was no guarantee that the requisite rehabilitation to meet the seismic safety requirements would result in preservation of the facade and other structural elements; and 4) any other developer would be faced with these rehabilitation costs. These findings are not challenged by the Foundation and are supported by the detailed seismic analysis and by the detailed and expert cost estimation in the EIR. Thus, these findings alone support the Board's implicit finding that the Weiner offer was not a "feasible alternative," and its express finding that there was no other financially and technically capable developer willing to acquire and rehabilitate the City of Paris.

■ The Foundation's substantive attack focuses on the Board's findings that: 1) Neiman-Marcus could not use the City of Paris building in any rehabilitated or renovated configuration as the available interior space did not meet Neiman-Marcus' merchandising requirements; 2) any alternative that contemplates rehabilitation of the existing structure would entail substantial delay with resultant higher construction costs and a substantial deferment and reduction of sales and tax revenues and other economic benefits to the City; and 3) that the benefits of the Project "override the significant environmental and urban design effects, including the historic effects (to the extent they have not been mitigated . . .), and any further mitigation measures which would eliminate, delay, or reduce those benefits are not feasible."

First, the Foundation argues that by approving the demolition and construction permits, the Board violated the mandate of the above quoted statutes to "mitigate or avoid" the significant effects of the Project wherever feasible. The contention ignores the Board's specific finding that the conditions imposed on the permits by the Planning Commission constituted a major mitigation of the significant historic, visual and urban design impacts of the Project.

The Foundation's major argument is directed at the Board's conclusion that it was not feasible to mitigate the significant effect of the

Project in favor of preservation. The Foundation maintains that the Board disregarded the substantive mandate of CEQA to give greater weight to environmental values than the needs of economic growth (*San Francisco Ecology Center* v. *City and County of San Francisco* (1975) 48 Cal.App.3d 584, 591 [122 Cal.Rptr. 100]). The statute, however, does not require the Board to reach a conclusion in favor of environmental values in each instance. The historic preservation aspects which deal with the quality of life involve complex and subtle considerations. Thus, subdivision (c) of Public Resources Code section 21002.1 quoted above specifically provides for the weighing of economic, social and "other" conditions.

As the court below found, the record contains ample substantial evidence to support the Board's conclusion as to the problems presented by the rehabilitation alternatives. The EIR indicated that each of the alternatives considered would have increased construction costs from $1.5 million to over $4 million. The fact that the alternatives would generate between approximately 15 to 50 percent less sales revenue for Neiman-Marcus would, therefore, greatly reduce tax revenues to the City. The Board's findings were also based on the data pertaining to the new employment opportunities and the economic multiplier effect on the City of the establishment of the specialty retail store proposed by Neiman-Marcus. The Board also considered the seismic safety and building code matters mentioned above and the needs of the City's many constituencies. The Board's conclusion that the adverse economic consequences of the preservation alternatives presented outweighed the other factors was not subject to reevaluation by the court below or this court.

■ Given the Board's findings, summarized above, we need not discuss at length the Foundation's contention that the Board's findings failed to comply with Public Resources Code section 21081, set forth, so far as pertinent, below.[13] The Foundation argues that the Board failed to make a necessary finding that the environmentally favorable

---

[13]"Pursuant to the policy stated in Sections 21002 and 21002.1, *no public agency shall approve* or carry out *a project* for which an environmental impact report has been completed which identifies one or more significant effects thereof *unless such public agency makes one, or more, of the following findings*:

"(a) *Changes* or alterations *have been* required in, or *incorporated* into, such project *which mitigate* or avoid the *significant environmental effects* thereof as identified in the completed environmental impact report......

"(c) *Specific economic, social,* or other considerations *make infeasible the* mitigation measures or *project alternatives* identified in the environmental impact report" (italics added).

alternatives were not feasible. While the Board did not use the precise statutory term "infeasible," it set forth the mitigation measures and provided nine different bases for its finding No. 3 that there was no feasible alternative to the Project. In finding No. 4, the Board stated that no alternative was capable of being accomplished in a successful manner within a reasonable time, "taking into account economic, environmental, social and technological factors." We think there can be no question that the Board's detailed findings satisfy the mandate of the statute.

■ We turn next to the Foundation's novel contention that the City's master plan mandates the preservation of the City of Paris because of the building's designation as a state historical landmark and listing on the National Register of Historic Places.

The National Historic Preservation Act of 1966 (16 U.S.C. § 470 et seq.) established the National Register of Historic Places "as a planning tool without restraint on private property interests.... No requirements of any kind are imposed on private initiative" (36 C.F.R. § 60.2(c) (1979)). The purpose of the National Register is to provide federal agencies with a list of sites that merit study before they may be affected by any federal project. Whenever such a site may be so affected, the Advisory Council on Historic Preservation must submit comments to the federal agency involved in the project. Even in those circumstances, however, preservation of the structure is not mandatory. The comments are "taken into account and integrated into the decision-making process, [but] the program decision rests with the agency implementing the undertaking" (36 C.F.R. § 60.2(c) (1979)). No duties are imposed on the states (*Ely* v. *Velde* (4th Cir. 1971) 451 F.2d 1130, 1139).

California's historic preservation statutes (Pub. Resources Code, §§ 5020-5033) provide only for the registration of state historical sites and also impose no restraints on the use of those sites and do not require preservation in any particular form. The only purpose of the state program is to list and mark significant sites; no special duties are imposed on state agencies or cities.

The Foundation concedes that the Board reaffirmed the City's 1974 refusal to confer landmark status on the City of Paris pursuant to article 10 of the City Planning Code, which establishes the City's landmark

preservation program[14] and concedes that City landmark designation is not significant as state and federal designations do not trigger its provisions.

■ Finding no mandate in the federal, state or city preservation laws, the Foundation then argues that the general provisions of the City Planning Code that provide for development in accordance with the master plan (City Planning Code, § 101 et seq.) and urban design conservation policies (which call for the conservation of notable landmarks and care in the remodeling of older buildings) require preservation of the City of Paris.

We note that neither of the master plan preservation policies was mentioned by the Planning Commission's resolution 8150; rather, in describing the admitted impact of the Project, resolution 8150 referred to the urban design policies relating to transition between older and new buildings and promoting harmony, which was the basis for the mitigation measures imposed.

Further, the Foundation also ignores the commerce and industry element of the City's master plan. As the EIR indicates, this element provides for the improvement of downtown San Francisco's position as a prime location for specialized retail trade and support for the "continued strength of high quality, specialty retail shopping facilities in the retail core." Further, as the EIR also states, the master plan calls for a balancing of aesthetic, urban design and preservation issues with economic and social issues.

The Foundation, of course, takes issue with the portion of the Board's finding No. 5 which declares that the establishment of a specialty retail store is in accordance with the commerce and industry element of the

---

[14]City Planning Code section 1011, so far as pertinent, provides: "(a) The Advisory Board may recommend, and the Planning Commission may approve, a list of structures of historical, architectural or aesthetic merit which have not been designated as landmarks and are not situated in designated historic districts. The said list may be added to from time to time. The purpose of this list shall be to recognize and encourage the protection, enhancement, perpetuation and use of such structures. The Advisory Board and the Planning Commission shall maintain a record of historic structures in the city which have been officially designated by agencies of the state or federal government, and shall cause such structures to be added to the aforesaid list.

"(b) *Nothing in this Article 10 shall be construed to impose any regulations or controls upon such structures of merit included on the said list and neither designated as landmarks nor situated in historic districts*" (italics added).

master plan. The Board's decision to balance the elements of the master plan is within its discretion and not subject to our review.

Finally, we turn to the Foundation's contention that the City was required to preserve the City of Paris unless Neiman-Marcus would otherwise be deprived of a reasonable return on its investment in the property. The Foundation relies on *Penn Central Transp. Co. v. New York City* (1978) 438 U.S. 104 [57 L.Ed.2d 631, 98 S.Ct. 2646]. Neither the facts nor the holding of *Penn Central* provide support for the Foundation's argument. In *Penn Central*, the owners brought suit to declare the New York Landmarks Preservation Law unconstitutional when the Landmarks Preservation Commission rejected the owners' plans to build a tower in excess of 50 stories on top of Grand Central Terminal. The United States Supreme Court held there was no unconstitutional taking of property because: 1) there was no interference with the owners' present use of the building as a terminal, as it had been so used for 65 years; 2) the owners were obtaining a reasonable return on their investment; 3) there was no showing that the commission would reject all plans for use of the air space above the terminal; and 4) the owners had obtained valuable development rights which were transferable to surrounding properties because the terminal was designated as a landmark.

The Foundation also cites *State, By Powderly v. Erickson* (1979 Minn.) 285 N.W.2d 84. In that case, however, the property in question, as in *Penn Central, supra,* 438 U.S. 104, had landmark status and the developer offered no evidence to rebut the prima facie case for preservation that had been made. Thus, the court concluded that the defendant developer had not met its burden of proof of overcoming the prima facie case and indicated that no evidence concerning the alternatives had been submitted. Here, as indicated above, no prima facie case for the preservation of the City of Paris was made and, as discussed above, the alternatives to demolition were fully considered and reported.

In *Lafayette Park Baptist Church v. Board of Adjustment of the City of St. Louis* (Mo.C.A., No. 41816, filed Apr. 29, 1980) the property in question (like the property in *Erickson* and *Penn Central*) had landmark status under a specific city historic preservation law. The court indicated that under its prior interpretation of the ordinance, demolition was permitted where the economics of restoration preclude the landowner from making any reasonable economic use of the property, if

restored, or the restoration is infeasible from a technical or mechanical standpoint (slip opn., at p. 5), and then reversed for insufficiency of the evidence on the issues. In contrast, here there was evidence that restoration was infeasible because of the seismic problems, and that the economics of restoration precluded any reasonable, economic use of the property by the owner.

In conclusion, we reiterate that the Board complied with the procedural and substantive mandates of CEQA and properly exercised its discretion, which encompasses broad factfinding powers and the exercise of its independent judgment. We agree with the trial court that the Board proceeded in the manner required by law, properly exercised its discretion, and that substantial evidence supports its findings. CEQA does not and cannot guarantee that the governmental decisions made with the environmental and historical consequences in mind will always be those which favor the environmental and historical considerations (cf. *Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 283 [118 Cal.Rptr. 249, 529 P.2d 1017]).

The judgment is affirmed.

Miller, J., and Smith, J., concurred.

A petition for a rehearing was denied July 11, 1980, and appellants' petition for a hearing by the Supreme Court was denied August 21, 1980.