[Civ. No. 25486. Fourth Dist., Div. Two. Aug. 12, 1982.]

VILLAGE LAGUNA OF LAGUNA BEACH, INC., et al., Plaintiffs and Appellants, v.
BOARD OF SUPERVISORS OF ORANGE COUNTY, Defendant and Respondent;
ALISO VIEJO COMPANY, Real Party in Interest and Respondent.

**COUNSEL**

Shute, Mihaly & Weinberger, E. Clement Shute, Jr., and Alletta D'A. Belin for Plaintiffs and Appellants.

Adrian Kuyper, County Counsel, and John R. Griset, Deputy County Counsel, for Defendant and Respondent.

McKenna, Conner & Cuneo, Bernard Kolbor, Aaron M. Peck, Edward Lasker, Edmond M. Connor and Douglas M. Rawlings for Real Party in Interest and Respondent.

## OPINION

**MORRIS, P. J.**—Aliso Viejo Company owns a 6,623-acre property that occupies a significant portion of southwest Orange County near Laguna Beach. On this land, the company proposes to build a new city, Aliso Viejo, with a population of possibly 60,000 persons. A precondition to this massive development is the amendment of the Orange County General Plan for that area. And, before the general plan can be amended, the California Environmental Quality Act (CEQA) requires that an adequate environmental impact report (EIR) be prepared. An EIR concerning the amendment of the general plan was submitted to and approved by the Orange County Board of Supervisors, who then adopted the proposed amendment. Appellants sought a writ of mandate to annul the approval of the EIR and the adoption of the amendment. The writ was denied and appellants have appealed, claiming that the EIR is legally insufficient and that the board of supervisors failed to make required findings prior to adopting the amendment. We find the EIR to be sufficient, but reverse because the board's findings are inadequate.

### SUFFICIENCY OF EIR

As this court recently stated in *Santiago County Water Dist. v. County of Orange* (1981) 118 Cal.App.3d 818, 822-823 [173 Cal.Rptr. 602], "An express purpose of CEQA is that state agencies give 'major consideration' to preventing damage to the environment when conducting their regulatory functions. (Pub. Resources Code, § 21000, subd. (g).)[1] To accomplish this, an environmental impact report is required to be written prior to a project's approval. (§§ 21100, 21151.) The EIR identifies significant effects of a project on the environment, the way those effects can be mitigated or avoided, and the alternatives to the project. (§ 21002.1, subd. (a).) It is 'an informational document which

---

"[1]All references are to the Public Resources Code unless otherwise stated."

... will inform public decision-makers and the general public of the environmental effects of projects they propose to carry out or approve.' (Cal. Admin. Code, tit. 14, § 15012.)[2] The EIR has been referred to as 'the heart of CEQA' and as 'an environmental "alarm bell" whose purpose it is to alert the public and its responsible officials to environmental changes before they have reached ecological points of no return.' (*County of Inyo* v. *Yorty* (1973) 32 Cal.App.3d 795, 810 [108 Cal.Rptr. 377].)

■ "In reviewing the [board of supervisors' actions], we are limited to deciding 'whether there was a prejudicial abuse of discretion ... [which] is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' (§ 21168.5.) Thus, we do 'not pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document.' (*County of Inyo* v. *City of Los Angeles* (1977) 71 Cal.App.3d 185, 189 [139 Cal.Rptr. 396].) However, we must be satisfied that the [board] has fully complied with the procedural requirements of CEQA, because only in this way 'can a subversion of the important public purposes of CEQA be avoided.' (*People* v. *County of Kern* (1974) 39 Cal.App.3d 830, 842 [115 Cal.Rptr. 67].)"

■ We further stated in *Santiago* that "the ultimate decision of whether to approve a project, be that decision right or wrong, is a nullity if based upon an EIR that does not provide the decision-makers, and the public, with the information about the project that is required by CEQA." (*Id.*, 118 Cal.App.3d at p. 829.) In the present case, petitioners contend that the EIR for the amendment of the county's general plan is inadequate in that the EIR does not evaluate all reasonable alternatives to the proposed amendment and that it does not discuss the environmental impacts which could occur should any of several assumptions in the EIR fail to be fulfilled.

One of the required features of an EIR is a "detailed statement setting forth ... [a]lternatives to the proposed project." (§ 21100, subd. (d).) The Guidelines state that "all reasonable alternatives" should be described, including the "no project" alternative. (Guidelines, § 15143, subd. (d).)

---

"2All further references to the California Administrative Code will be cited as Guidelines."

Prior to the amendment at issue here, the land use element of the general plan allowed for just over 10,000 dwelling units to be developed over about 1,310 acres of the Aliso Viejo property. After the adoption of the amendment, over 28,000 dwelling units may be developed over 2,472 acres. The company plans to build 20,000 dwelling units.

The EIR discusses four alternatives to the 20,000 dwelling unit proposal of the company. The first is the "no development" alternative, which the Guidelines expressly require to be examined. This alternative would maintain the property in its present condition of having only four residences and of being used for barley production and cattle grazing. The second alternative discussed is the maintenance of the prior land use element which allowed just over 10,000 dwelling units. The third is described as the "low density" alternative, which calls for 7,500 dwelling units. The fourth alternative is a "high density" plan envisioning 25,000 dwelling units.

■■■ Appellants' claim of inadequacy is based on the failure of the EIR to consider as an alternative the development of "some number" of dwelling units between the 10,000 authorized by the prior land use element and the 20,000 proposed by the company. Appellants contend that this omission is significant, because the development of an intermediate number of homes is the most obvious alternative. Indeed, they point to a proposal that was made by one member of the board of supervisors that only 16,000 dwelling units be authorized. We conclude, however, that the EIR evaluation of plans for the development of 0, 7,500, 10,000, 20,000, and 25,000 dwelling units was sufficient to satisfy the informational goal of CEQA.

In the present case, there are literally thousands of "reasonable alternatives" to the proposed project. Certainly, if the building of 0 and 25,000 homes are reasonable alternatives to the proposed 20,000 dwelling unit plan, then the building of 1,000, 16,000, 22,500, and 20,001 homes are reasonable alternatives. But, no one would argue that the EIR is insufficient for failure to describe the 20,001 home alternative. ■ ■■■ ■ Thus, as both the California and federal[3]

---

[3]Because CEQA was modeled on the National Environmental Policy Act, judicial interpretation of the latter is persuasive authority in interpreting CEQA. (*Wildlife Alive* v. *Chickering* (1976) 18 Cal.3d 190, 201 [132 Cal.Rptr. 377, 553 P.2d 537]; *Environmental Defense Fund, Inc.* v. *Coastside County Water Dist.* (1972) 27 Cal.App.3d 695, 701 [104 Cal.Rptr. 197].)

courts have recognized, "[t]he statutory requirements for consideration of alternatives must be judged against a rule of reason." (*Foundation for San Francisco's Architectural Heritage* v. *City and County of San Francisco* (1980) 106 Cal.App.3d 893, 910 [165 Cal.Rptr. 401]; see also *Residents Ad Hoc Stadium Com.* v. *Board of Trustees* (1979) 89 Cal.App.3d 274, 286 [152 Cal.Rptr. 585]; *Vermont Yankee Nuclear Power Corp.* v. *NRDC* (1978) 435 U.S. 519, 551 [55 L.Ed.2d 460, 483, 98 S.Ct. 1197]; *Coalition For Canyon Preservation* v. *Bowers* (9th Cir. 1980) 632 F.2d 774, 783.)

It is significant that no claims of deficiencies are made concerning the discussions of the four alternatives that were considered in the EIR. Therefore, it must be assumed that decision-makers and the public could make an informed comparison of the environmental effects of those various plans. It is not then unreasonable to conclude that an alternative not discussed in the EIR could be intelligently considered by studying the adequate descriptions of the plans that are discussed.[4] This EIR should "not become vulnerable because it fails to consider in detail each and every conceivable variation of the alternatives stated." (*Brooks* v. *Coleman* (9th Cir. 1975) 518 F.2d 17, 19.)

"Absolute perfection is not required; what is required is the production of information sufficient to permit a reasonable choice of alternatives so far as environmental aspects are concerned." (*Foundation for San Francisco's Architectural Heritage, supra*, 106 Cal.App.3d at p. 910.) The requirement has been fulfilled here.

■ Appellants further fault the EIR for making assumptions about the proposed project but failing to consider the environmental effects should any of those assumptions prove erroneous. Specifically, they note the following assumptions: (1) that the San Joaquin Hills Transportation Corridor, which would bisect Aliso Viejo and would serve as one of "the primary access routes linking coastal and southern areas with inland and northern points," will be built; (2) that the Greenbelt, which encompasses "[o]ver one-half of the total acreage of the project, includ-

---

[4]For example, in the discussion of the 10,000 home alternative, the EIR states, "The lower level of development would reduce vehicle trip generation and total vehicle miles traveled, thereby minimizing air quality impacts (Table IV-1) from the site." Table IV-1, in turn, informs the reader that the "vehicle miles traveled" would be 853,200 for the 7,500 home alternative, 1,097,300 for the 10,000 home alternative, 1,526,900 for the 20,000 home proposed plan, and 1,584,000 for the 25,000 home alternative. From this data, one could discern the vehicle miles traveled and the air quality impacts of a 16,000 home alternative relative to the proposed plan.

ing some of the more important physical, biological and scientific/ cultural resources," will be preserved; and (3) that 25 percent of the proposed 20,000 dwelling units will be affordable housing units.[5]

Appellants are asking more of the EIR than is legally required. The "assumptions" referred to are actually integral portions of the proposed project. If they fail to become reality (e.g., if the transportation corridor is not built), we are dealing with a different project. However, CEQA only requires that an EIR discuss "[t]he significant environmental effects of *the proposed project.*" (§ 21100, subd. (a), italics added.) The proposed project, which includes the transportation corridor, a preserved Greenbelt and 25 percent affordable housing, *was* evaluated in the EIR. CEQA requires nothing more.

Significantly, CEQA has anticipated in another context the situation about which appellants now express concern. Section 21166 requires a subsequent or supplemental EIR to be prepared if major revisions of the original EIR are required by "(a) Substantial changes [which] are proposed in the project" or by "(b) Substantial changes [which] occur with respect to the circumstances under which the project is being undertaken." (See also Guidelines, §§ 15067, 15067.5.) The future occurrence or nonoccurrence of the "assumptions" therefore does not affect the sufficiency of the present EIR, but rather is relevant in determining whether a subsequent or supplemental EIR should be prepared.

We find support for this position in the federal cases that discuss whether an environmental impact statement (EIS) for a proposed project must also evaluate the environmental effects of related projects. The Supreme Court has held that such is not necessary if the related project has only been contemplated, but not proposed. The court stated, "The statute [National Environmental Policy Act] ... speaks solely in

---

[5]The assumptions are asserted to be questionable for the following reasons: (1) Construction of the transportation corridor is in doubt, because there is currently no funding for it; (2) the Greenbelt may not be preserved, because, although the company is required to enter into a 15-year offer of dedication to the county, the county is not required to accept the dedication; and (3) although many housing units are planned for moderate income persons, there is little resale control, so that the stock of affordable housing will likely decline as the original owners sell their homes.

Respondents' defense of the EIR in this respect is based on showing the reasonableness of the assumptions. For example, they claim that the transportation corridor has been an important part of the county's master plan of arterial highways since 1976 and cannot be eliminated without an amendment to the general plan. However, as we explain, it is unnecessary in this case to assess the reasonableness of the assumptions.

terms of *proposed* actions; it does not require an agency to consider the possible environmental impacts of less imminent actions when preparing the impact statement on proposed actions. Should contemplated actions later reach the stage of actual proposals, impact statements on them will take into account the effect of their approval upon the existing environment . . . ." (*Kleppe* v. *Sierra Club* (1976) 427 U.S. 390, 410, fn. 20 [49 L.Ed.2d 576, 590, 96 S.Ct. 2718], original italics; see also *South La. Environmental Council, Inc.* v. *Sand* (5th Cir. 1980) 629 F.2d 1005, 1015-1016; *Minnesota Public Interest Research Group* v. *Butz* (8th Cir. 1976) 541 F.2d 1292, 1307, cert. den. (1977) 430 U.S. 922 [51 L.Ed.2d 601, 97 S.Ct. 1340]; *Sierra Club* v. *Sigler* (S.D.Tex. 1982) 532 F.Supp. 1222, 1235-1236.) Certainly, implementation of the proposed project in the present case without the Transportation Corridor, a preserved Greenbelt, or 25 percent affordable housing is even less imminent than a contemplated project, since the contemplation here is that the failure of the "assumptions" will *not* occur.

Appellants' reliance on this court's opinion in *Santiago County Water Dist.* v. *County of Orange, supra*, 118 Cal.App.3d 818, is misplaced. There we held insufficient an EIR that failed to describe the additional water delivery facilities that would have to be built to accommodate the proposed project, a sand and gravel mine. We stated, "Because of this omission, some important ramifications of the proposed project remained hidden from view at the time the project was being discussed and approved." (*Id.*, at p. 830.) Here, however, as has already been said, the proposed project itself has been fully evaluated in the EIR and any omitted discussions are of other projects, not the project under consideration.

Appellants also rely on *Chelsea Neighborh'd Ass'ns* v. *United States Post. Serv.* (2d Cir. 1975) 516 F.2d 378. In that case, the proposed project was a postal service vehicle maintenance facility (VMF) in combination with a multistory housing project in New York City. The court held the EIS to be insufficient on a number of grounds, one of which was discussed in full as follows: "This brings us to the failure of the EIS to disclose that the housing might never be built at all, the second defect found by Judge Ward. While the impact of the VMF alone was analyzed, the treatment of the VMF without housing was in some instances perfunctory compared with the analysis of the VMF with housing. This defect in itself may well be easily remedied. More significant, however, is the failure to assess the importance and impact of the

VMF by itself. The lack is fatal to the EIS for it is at least possible that without the housing the 'Assessment of Trade Offs' would result in a decision not to proceed with the project at all. We do not suggest that it would be arbitrary or capricious for the Service to reach a. contrary conclusion, but such a judgment must come only after full consideration of the VMF standing alone." (*Id.*, at p. 389, fn. omitted.)

Unlike respondents, we cannot ignore the *Chelsea* case. However, neither are we able to reconcile it with our holding here. Therefore, we simply disagree with that court's analysis, also noting that *Chelsea* precedes *Kleppe* and the other federal cases cited above (see also *Sierra Club* v. *Sigler, supra*, 532 F.Supp. at p. 1236, fn. 32) and that *Chelsea* cites no case or statutory authority in support of the holding pertinent here.

The EIR for the amendment of the Orange County General Plan was in compliance with the requirements of CEQA.

## SUFFICIENCY OF BOARD'S FINDINGS

█ Because the EIR identified significant environmental effects[6] that will be caused by the amendment of the general plan, the board of supervisors could not approve the amendment unless it made one or more of the following findings: "(a) Changes or alterations have been required in, or incorporated into, [the] project which mitigate or avoid the significant environmental effects thereof as identified in the completed environmental impact report. [¶] (b) Such changes or alterations are within the responsibility and jurisdiction of another public agency and such changes have been adopted by such other agency, or can and should be adopted by such other agency. [¶] (c) Specific economic, social, or other considerations make infeasible the mitigation measures or project alternatives identified in the environmental impact report." (§ 21081.) Guidelines section 15088, subdivision (a) requires that there be a finding or findings for each significant effect and that each finding be written and be "accompanied by a statement of the facts supporting each finding." Appellants claim that the board's findings are inadequate. We agree.

---

[6]"'Significant effect on the environment' means a substantial, or potentially substantial, adverse change in the environment." (§ 21068.)

The board did make the finding[7] that "[s]pecific economic, social, technological or other considerations make improbable the mitigation measures or project alternatives identified to reduce the effects of some significant environmental effects of the plan." (See § 21081, subd. (c).) However, the board has not adequately disclosed its reasons for coming to this conclusion.

After making the general finding above, the board listed a total of 26 unavoidable adverse effects divided among 8 different categories. Then, for each of the eight categories, the board purported to state in a paragraph why the adverse effects in the particular category were going to be allowed to occur. For example, one category reads as follows:

"f. *Natural Resources*

"(1) Loss of natural resources due to development construction.

"(2) Change of the agricultural dry farming area to open space and urban uses.

"(3) Permanent loss of 1925 acres of agricultural soils (Class I through IV) including 98 acres of Class I and II soils.

"Prime agricultural soils, energy resources and other nonrenewable resources will be used due to the development of this project. This adverse impact will only be mitigated through the No Development alternative which is considered economically infeasible. The social benefits of the project which provide housing, employment and recreational opportunities override the plan's impact on non-renewable resources."

We believe the "Natural Resources" finding is characteristic of the findings for the other seven categories. Thus, since all eight findings suffer from the same deficiencies, we deal specifically with only the faults of one.

In making its finding on the "Natural Resources" significant environmental effects, the board stated that only the "No Development" alternative could mitigate those effects and that that alternative was economically infeasible. This treatment of alternatives is lacking in two

---

[7]The findings discussed here are actually contained in a resolution of the Orange County Planning Commission recommending the adoption of the amendment of the general plan. However, the board of supervisors, in adopting the amendment, also adopted the findings of the planning commission. No question is raised as to the validity of this procedure.

significant respects—there is no discussion of the other EIR alternatives and there is no explanation of why the alternative that is mentioned is economically infeasible.

Having not made changes or alterations in the project to avoid or mitigate the listed significant environmental effects, the board was required by CEQA to find that some consideration made "the mitigation measures or project alternatives identified in the" EIR infeasible. (§ 21081, subd. (c).) The plain meaning of the statute thus demands that each of those mitigation measures or project alternatives which are identified in the EIR and are not adopted must be expressly rejected as infeasible. The board, however, made a finding about only one of the four alternatives discussed in the EIR. This is in direct contravention of the law.

Additionally, the finding is insufficient even regarding the project alternative which is discussed. Although the board stated that the "No Development" alternative was economically infeasible, it did not explain *why* it found the alternative economically infeasible. Such was required by Guidelines section 15088, subdivision (a) which mandates that the board's finding be "accompanied by a statement of the facts supporting each finding." It is not enough that the board found that "[t]he social benefits of the project which provide housing, employment and recreational opportunities override the plan's impact on non-renewable resources." The statement is conclusionary and too general. This was sufficient to show which "[s]pecific ... social ... considerations" the board felt made the "No Development" alternative infeasible, but it does not constitute "a statement of the *facts*" supporting the finding. (Cf. *Foundation for San Francisco's Architectural Heritage* v. *City and County of San Francisco, supra*, 106 Cal.App.3d 893, 913-914.)

The state policy is that "public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects" (§ 21002) and that "[e]ach public agency shall mitigate or avoid the significant effects on the environment of projects it approves or carries out whenever it is feasible to do so." (§ 21002.1, subd. (b).) ██ Since the finding requirement was expressly enacted pursuant to that policy (see § 21081), it is clear that the purposes of section 21081 are that there be some evidence that the alternatives or mitigation measures in the EIR actually were considered by the decision making agency and, as the Supreme Court stated

in a similar situation, that there be a disclosure of "the analytic route the ... agency traveled from evidence to action." (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 515 [113 Cal.Rptr. 836, 522 P.2d 12]; see also *Markley* v. *City Council* (1982) 131 Cal.App.3d 656, 671 [182 Cal.Rptr. 659].) Thus, when a project is approved that will significantly affect the environment, CEQA places the burden on the approving agency to affirmatively show that it has considered the identified means of lessening or avoiding the project's significant effects and to explain its decision allowing those adverse changes to occur.

The writing of a perfect EIR becomes a futile action if that EIR is not adequately considered by the public agency responsible for approving a project. Indeed, it is almost as if no EIR was prepared at all. In the present case, there is no evidence that the board ever considered any EIR alternative to the project except the "No Development" alternative.

Additionally, even though the board may have fully considered the EIR and made a wise and eminently rational decision in approving the proposed project, the board's thinking process, its "analytic route," has not been revealed. Only by making this disclosure can others, be they courts or constituents, intelligently analyze the logic of the board's decision.

Respondents claim that CEQA requires only that there be a "discernible balancing of the environmental consequences of the project against its benefits." Even were this the proper standard, which we do not think it is,[8] the board's findings are not sufficient. The conclusionary, almost boilerplate, language of the findings is insufficient evidence that such balancing occurred.

---

[8]Respondents' support for this standard rests on *Residents Ad Hoc Stadium Com.* v. *Board of Trustees, supra*, 89 Cal.App.3d 274. The court there held that the defendants were not required to make section 21081 findings because the project was approved prior to the enactment of section 21081 and that the presection 21081 CEQA indicated a legislative intent that findings not be required. (*Id.*, at p. 282.) Near the end of the discussion of findings, the court stated, "Plaintiffs' assertion that in the absence of findings, there was no *discernible balancing of the environmental consequences of the project against its benefits*, considered in the light of the lengthy proceedings held both by the Trustees and the Fresno State University administrators, is best characterized as a palpable distortion of the record." (*Id.*, at p. 283, italics added.) We cannot accept as the standard for section 21081 findings a phrase taken out of context from a case that does not even interpret section 21081.

## DISPOSITION

The judgment is affirmed only insofar as it denies appellants' application for a writ of mandate commanding the board to set aside its certification of the EIR. In all other respects, the judgment is reversed. All parties shall bear their own costs on appeal.

Kaufman, J., and Trotter, J., concurred.