**Paul KOLLSMAN: Tashi Land Corporation, a New York corporation, Plaintiffs,**

v.

**CITY OF LOS ANGELES, a municipal corporation, Defendant.**

**No. CV 77–0770–ALS.**

United States District Court, C.D. California.

Feb. 1, 1983.

---

Jerrold A. Fadem, Michael Berger, Richard D. Norton of Fadem, Berger & Norton, Santa Monica, Cal., for plaintiffs.

Ira Reiner, City Atty., Gary R. Netzer, Asst. City Atty., William L. Waterhouse, Deputy City Atty., Los Angeles, Cal., for defendant.

## MEMORANDUM DECISION

STEPHENS, District Judge.

### JURISDICTION

This court has jurisdiction founded on diversity of citizenship and amount in controversy pursuant to Title 28, United States Code Section 1332.

Plaintiff is a citizen of the State of New York and defendant is a municipal corporation incorporated under the laws of the State of California having its principal place of business in the State of California. The matter in controversy exceeds, exclusive of interest and costs, the sum of ten thousand dollars. The court also has jurisdiction founded upon Title 28, United States Code Section 1331, the existence of a federal question.

### SCOPE OF THIS OPINION

This opinion is limited in its scope to Count VII, added with the permission of the court to conform to proof, without deciding the constitutional questions raised in other counts, a procedure which honors the principle that preferably controversies should be decided upon other than constitutional grounds. The court has retained jurisdiction of the other counts.

The facts are largely undisputed. However, in some instances there are conflicts in the evidence which must be resolved. The facts as stated in this opinion represent a resolution of conflicting evidence as well as a recitation of the undisputed facts. Where there is a conflict in the evidence, the statement of the court in this opinion is intended as a finding of fact. To contribute to clarity, the opinion combines fact and law. The court intends that its statements of law be

taken as the court's conclusions of law. *See* Fed.R.Civ.Pro. 52(a).

## PROCEDURAL HISTORY

On March 1, 1977, plaintiffs filed a six count complaint for inverse condemnation and a declaration that certain actions by the City were invalid. Counts I, II, and III raised claims under the Taking and Equal Protection Clauses of the United States Constitution. Counts IV, V, and VI raised claims under various provisions of California state zoning and environmental control laws.

On March 31, 1977, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, defendants moved to dismiss Counts II, III, IV, V and VI. The motion was granted only as to Count V. Thereafter, on May 16, 1977, the City filed its answer to plaintiffs' complaint.

On September 8, 1977, the City filed a second motion to dismiss for lack of diversity of citizenship jurisdiction and on the grounds that this court should abstain from exercising federal question jurisdiction. On November 22, 1977, the City's motion to dismiss was denied.

On February 10, 1978, the City filed a motion for summary judgment, pursuant to Rule 56, Federal Rules of Civil Procedure, seeking a summary judgment as to plaintiffs' five remaining causes of action. Summary judgment was granted as to Count IV and Count VI, and denied as to Counts I, II, and III.

On March 15, 1978, the City filed a petition for writ of mandamus in the United States Court of Appeals for the Ninth Circuit. The City argued before the Court of Appeals that plaintiffs' complaint was not ripe for adjudication and that the district court exceeded its jurisdiction and abused its discretion by declining to abstain from exercising jurisdiction over this case. On June 7, 1978, the Court of Appeals denied

the petition for writ of mandamus stating in an order as follows:

"We cannot concur, at this stage of the proceedings, that the complaint of the real parties in interest fails to present a justiciable controversy. Nor can we now find that the district court has abused its discretion in declining to abstain as the unsettled issues appear to include substantial federal constitutional questions."

On August 10, 1978, the Court of Appeals denied the City's petition for rehearing and suggestion for rehearing en banc.

On July 27, 1978, the City filed a motion to strike plaintiffs' demand for a jury trial and said motion was granted. The first phase of the trial was a six day court trial ending April 5, 1979. On November 26, 1979, plaintiffs' development application was disapproved by the City for lack of completeness. Subsequently, the court viewed subject property and two more days of trial were conducted, ending April 22, 1981.

On February 17, 1982, at the suggestion of the court, Kollsman filed a motion for leave to amend his complaint to conform to the evidence pursuant to Rule 15(b) of the Federal Rules of Civil Procedure. In a minute order dated February 22, 1982, the court granted the motion. Kollsman's amendment adds two causes of action. Count VIII was a civil rights claim under 42 U.S.C. § 1983 against the City. Kollsman argued that as a result of the United States Supreme Court's ruling in *Monell v. Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), he was entitled to raise a claim under 42 U.S.C. Section 1983 against the City.[1] This count has not been litigated. Count VII was added to conform to proof. This cause of action involved the application of Cal. Government Code Sections 65920 *et seq.* (Review and Approval of Development Projects), which became effective while this case was pending. Since as expressed in this opinion, Kollsman is entitled to relief under the

---

1. *Monell* held, contrary to existing law at the time, that municipal corporations are "persons" within the meaning of 42 U.S.C. § 1983, and thus subject to liability for civil rights violations.

provisions of Cal. Government Code Sections 65920 *et seq.,* it is unnecessary to address his claims under the United States Constitution and 42 U.S.C. Section 1983 at this time.

### THE CITY'S SUBDIVISION PROCESS

A discussion of the facts requires reference to the City's subdivision approval procedure.[2] A prospective subdivider initiates the process for subdivision approval by submitting to the City Planning Department a "Tentative Tract Map" which must describe the proposed development project. This Tentative Map is circulated among a number of City departments for comment. The departments respond through written reports which are submitted to the Planning Department to be consolidated and considered by a Deputy Advisory Agency, a member of the Planning Department staff with the statutory power to approve, conditionally approve, or disapprove the proposed subdivision. Prior to making its decision on the Tentative Map, the Deputy Advisory Agency notifies all property owners within 300 feet of the property proposed to be subdivided of a public hearing to consider the proposal.

Along with the reports from various City departments, the Deputy Advisory Agency also has the benefit of information developed through the City's environmental review process. This procedure is mandated by the California Environmental Quality Act of 1970 (hereafter "CEQA" Pub. Resources Code Section 21000 *et seq.*) and the State and City Guidelines promulgated under its authority. CEQA requires that the City undertake a preliminary analysis of all projects which may have an impact on the environment. In Los Angeles, this initial screening is accomplished by a Planning Department Environmental Review Committee. If the screening identifies any "significant" effects on the environment which may arise from the project, then the Planning Department may require the de-

veloper to submit material for preparation of a draft Environmental Impact Report (EIR). This draft EIR, once complete, is then used by the Planning Department to develop a full-scale analysis of all potential environmental impacts. This analysis is circulated to interested government agencies, the State Clearinghouse in Sacramento, and the public for its review and comment. Once all comments are received, the analysis emerges in the Final EIR. This final EIR must be certified as complete and then used by the Deputy Advisory Agency in making his final decision. Pub. Resources Code § 21151.

If the information submitted by the developer for preparation of a draft EIR is inadequate, subsequent submissions are required until enough information is provided for the City to describe the project, its impacts, and alternatives in sufficient detail to solicit public comments.

If the Deputy Advisory Agency disapproves the proposed subdivision, the developer may appeal to the City Planning Commission and, if necessary thereafter, to the City Council. L.A.M.C. § 17.06. If the Deputy Advisory Agency approves the subdivision, any "interested person adversely affected by the proposed subdivision" may appeal to the Commission and then to the Council. *Id.* Ordinarily, approved subdivisions are subject to a number of conditions which must be satisfied before construction begins, such as dedication of property for streets, installation of necessary utilities, etc. Once the conditions for approval have been satisfied, the subdivider may submit to the City his Final Tract Map. L.A.M.C. § 17.07. When this Final Map is accepted and recorded, the subdivider may commence construction and sell lots.

Elements of the City's General Plan—like the Beverly Crest-Bel Air District Plan—play an important role in the subdivision process. Under state law, a subdivision cannot be approved unless the Advisory Agency makes a finding that the develop-

---

2. This narrative summarizes the provisions of the Los Angeles Municipal Code, Sections 17.-00 through 17.49.

ment is "consistent with applicable general or specific plans." Cal.Gov.Code § 66474.-60. This Advisory Agency finding is based on all available information, including the final EIR and reports from City Departments, and cannot be made until that information base is complete.

FACTS

In 1946 Kollsman purchased a Mediterranean-style home in the Santa Monica mountains above Beverly Hills. The home was situated on 12 acres of land. Thereafter, Kollsman began acquiring other undeveloped property surrounding his home intending to subdivide it as he neared his retirement. The most recent acquisition was made in 1964, when Kollsman purchased a house and two neighboring lots on Benedict Canyon Drive.

In 1946 the zoning for subject property was R–1, with a minimum lot size of 5,000 square feet. In 1960 R–1–4 zoning was established which changed the minimum lot size to 15,000 square feet. In 1971 an amendment to the zoning plan was passed which allowed a maximum density on subject property of 60% of the maximum dwelling unit density shown on the existing plan.

On January 12, 1977, as a result of Kollsman's efforts and those of his engineers and geologists, Kollsman submitted to the City's Planning Department an Environmental Assessment Form and Tentative Tract Map 33300, which showed his proposed residential subdivision. One day later, on January 13, 1977, the City Council adopted the Beverly Crest-Bel Air District Plan. The District Plan limits development of private property in two ways. First, the property is given a minimum density designation which means the maximum density permitted is 0.5 to 1 dwelling per acre. Second, dwelling unit density is limited by the slope-density formula. According to the formula, the allowable density for residential development is as follows:

$$D = \frac{50-S}{35};$$

$D =$ maximum number of dwelling units per gross acre allowable.

$S =$ average slope of the land in percent.

Pursuant to this formula, the City claims plaintiffs would be permitted to divide the 85 acres of subject property into a maximum of nine (9) building lots instead of the seventy (70) he originally proposed and the maximum eighty-five (85) lots permitted under the District Plan without the slope-density formula.

In a document dated February 2, 1977, the City's Planning Department informed Kollsman that a focused environmental impact report should be prepared by Kollsman, including a discussion of "slope analysis" and an alternative residential design towards preserving existing topography.[3] The City's Environmental Review Committee adopted the City Planning Department's recommendation on February 9, 1977.

On February 16, 1977, the Environmental Review Committee transmitted to Kollsman an "Environmental Evaluation Form" which specified the areas which Kollsman was required to address in his EIR.[4]

On July 28, 1977, Kollsman submitted a first draft EIR. The first draft discussed project alternatives including the statutorily mandated "no project" alternative, Cal. Pub. Resources Code, §§ 21002, 21100, but did not address the impact of the slope-density formula on the Kollsman property, or a project alternative known as "cluster" hous-

---

**3.** At this time, the City could lawfully require Kollsman to provide them with a focused EIR. Cal.Gov.Code § 65941, which became effective September 26, 1978, prohibits the City from requiring the applicant to submit the "informational equivalent of an environmental impact report as part of a complete application."

**4.** The Evaluation Form states in pertinent part that "[t]he ERC [Environmental Review Committee] initial study indicates that impacts could occur from this project's implementation due to the following considerations: 1) Major Land Forms; 2) Hydrology; 3) Illumination; 4) Traffic; 5) Access; 6) Sanitary Sewers; 7) Solid Waste; 8) Water Runoff; 9) Public Facilities (police, fire, parks, library). An EIR should be prepared addressing all these impacts as well as project alternatives; appropriate mitigation measures; and, energy conservation."

ing.[5] On September 13, 1977, Kollsman submitted ten copies of a second draft EIR which was 58 pages long. The City circulated this draft to the various homeowners' associations.

On November 20, 1977, the Environmental Review Committee marked the Kollsman draft EIR as a "data base", and specified that "support data" on slope density and cluster alternatives was needed, as well as additional engineering information.[6] The requested engineering information was supplied by Kollsman's engineer on March 3, 1978. Slope density and cluster alternatives were not discussed in this report.

In a letter dated May 11, 1978, the Environmental Review Committee informed Kollsman that it would suspend processing of Kollsman's development application, since Kollsman, on the advice of legal counsel, did not specifically and independently discuss slope density and cluster project alternatives.[7]

On September 26, 1978 amendments to Cal.Gov.Code §§ 65924 and 65925 became effective. Section 65941 prohibits the City from requiring of a development applicant "the informational equivalent" of an EIR. Section 65924 requires that with respect to applications received prior to January 1, 1978, but not yet determined to be complete, the City must make such determination not later than 60 days after the effective date of the amendment. This would have required the City to consider all of the information available to it, evaluate the information, and make a good faith determination of completeness or incompleteness of the Kollsman application no later than November 25, 1978.

On November 22, 1978 the Planning Department notified Kollsman that his development application was incomplete. The reasons stated by the City were that (1) the Bureau of Engineering required additional information,[8] and (2) Environmental Assessment Data or an EIR was needed. It is important to note that at this time the City had the responsibility for preparing the EIR, Cal.Pub. Resources Code § 21082.1, and could not lawfully, under Cal.Gov.Code § 65924, require the informational equivalent of an EIR. The evidence establishes that by November 22, 1978, Kollsman had provided the City with sufficient environmental and engineering information to enable the City to prepare a legally adequate EIR. When this notification was sent to Kollsman, the City knew that it was insufficient for failure to indicate the manner in which the information could be made complete. The City knew by May 12, 1978 that Kollsman thought that all engineering information and environmental assessment data required by the City had already been furnished. In these circumstances, good faith as well as the specific provisions of Government Code § 65943 required identification of any type of engineering information or environmental data still needed by the City to enable it to prepare an EIR. The City also knew that Kollsman had not previously hesitated to promptly comply with all of the City's requests for information.

In a document dated January 12, 1979, the City informed Kollsman that it could not schedule a public hearing regarding approval of his tract application until "specified items have been completed." The document indicates that environmental clearance was required, and that the Planning

5. Implementation of the cluster alternative would have violated the local residential zoning classification which requires each lot to be an average minimum of 15,000 square feet.

6. Shortly after the City made this request, Cal. Gov.Code § 65920 et seq., which deals with Review and Approval of Development Projects, became effective on January 1, 1978.

7. On May 12, 1978 in a letter to the City, Kollsman's engineer stated: "I sincerely regret

that you are unable to complete a suitable draft EIR, but I cannot accept the inference that it is the lack of input from this office that is the cause of said inability."

8. The City does not specify in this notification what engineering information is needed, although Gov.Code § 65943 provides: "and shall indicate the manner in which [the application] can be made complete."

Department was waiting for completion of a "full EIR."

A reasonable construction of this document would indicate that the Planning Department could not schedule a public hearing because it did not have clearance from the Environmental Review Committee. Environmental clearance may not be given by the Environmental Review Committee without completion of a full EIR. Since it is the City's responsibility to prepare the full EIR, it is manifestly unjust that Kollsman should be penalized on the basis of submitting an "incomplete" application, when the material which would have made the application complete, *viz.*, a full EIR, was being withheld by the City itself. All circumstances which the evidence disclosed being considered, the lack of specificity in the City's notices to Kollsman is quite apparently deliberately vague.

On November 14, 1979, the City gave Kollsman notice of intent to disapprove his application without prejudice. The notice states in part: "It is the intent of the Advisory Agency to administratively disapprove all pending cases approaching the one year deadline whenever a determination of approval cannot be made due to lack of submission of sufficient information."

It is unclear why the City would feel compelled to approve or disapprove Kollsman's application before the one year deadline imposed by Cal.Gov.Code §§ 65950 and 65956. These sections apply only to *complete* applications. If Kollsman's application was, as the City argues, incomplete for lack of sufficient information, there was no need for the City to meet the deadline imposed by § 65950. The City was free, under § 65956, to disapprove the application for lack of completeness at any time, if it felt that Kollsman was not, with reasonable diligence, supplying information suffi-

cient for completeness. *See* Sahm, *Project Approval Under the California Environmental Quality Act: It Always Takes Longer Than You Think*, 19 Santa Clara L.Rev. 579 (1979); Cal.Gov.Code § 65956(b).

Shortly thereafter, on November 26, 1979, the City gave Kollsman notice that his development application was disapproved because he "failed to provide the requested information." Kollsman did not appeal this decision to the City Planning Commission.[9]

## DISCUSSION AND DECISION

A. *Kollsman Properly Amended His Complaint to Conform to the Evidence Pursuant to Rule 15(b).*

Rule 15(b) of the Federal Rules of Civil Procedures provides:

(b) Amendments to Conform to the Evidence. When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable

---

**9.** A "Stipulation and Order" signed by Kollsman and the City on December 11, 1979 states that "[i]t is hereby stipulated between Plaintiffs and Defendant, by and through their respective attorneys of record, that the running of the time for the filing of an appeal to the City Planning Commission from the action of the Advisory Agency in the matter of Tentative

Tract No. 33300 be tolled from November 26, 1979 to and including the date upon which judgment in this matter becomes final. It is further stipulated that the aforesaid stipulation shall not affect the ability of either party to raise issues of fact and law in any phase of the instant action."

the objecting party to meet such evidence.

■ Rule 15(b) was designed to provide the maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities. 6 Wright & Miller, *Federal Practice & Procedure,* § 1471, p. 359 (1971); *Hardin v. Manitowoc-Forsythe Corp.,* 691 F.2d 449 (10th Cir.1982). "It is well-settled that the amendment of pleadings to conform to proof under Rule 15(b) of the Federal Rules of Civil Procedure rests in the sound discretion of the trial court." *Cole v. Layrite Products Co.,* 439 F.2d 958 (9th Cir.1971) (citations omitted), *quoted with approval in Gonzales v. United States,* 589 F.2d 465 (9th Cir.1979); *Save Lake Washington v. Frank,* 641 F.2d 1330 (9th Cir.1981). Leave to amend is to be freely given "when justice so requires," Fed.R.Civ.Pro. Rule 15(a); *Stiles v. Gove,* 345 F.2d 991 (9th Cir.1975), and refusal to grant leave to amend without any justifying reason is an abuse of the trial court's discretion. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).

■ Rule 15(b) permits amendment of the complaint to conform to the evidence at any time during the proceedings, even after judgment, when the unpled issues have been tried by express or implied consent of the parties. As stated recently by the Tenth Circuit, "[t]he test of consent is whether the opposing party had a fair opportunity to defend and whether he could have presented additional evidence had he known sooner the substance of the amendment." *Hardin v. Manitowoc-Forsythe Corp., supra* at 456. Consent will generally be found where the party objecting to the motion to conform acquiesced in the introduction of evidence bearing on the new issue, or himself produced evidence on the new issue. *Hardin v. Manitowoc-Forsythe Corp., supra* at 457; *Dering v. Williams,* 378 F.2d 417 (9th Cir.1967).

■ The record makes it clear that the City made no objection to the admission of evidence which made apparent that the objective of the litigation might be attainable without adjudicating the constitutional issues. The evidence was largely documentary in nature at the time it was introduced. In fact, the City itself introduced through documents and testimony much of the evidence which formed the basis of the claim under Cal.Gov.Code § 65920 *et seq.* Under these circumstances, the Court finds that the City gave implied consent to the trial of the issues raised by the amendment to conform to the evidence.

■■ The City argues that the lapse of time between the trial and Kollsman's motion to conform unduly prejudiced the City because it prevented it from having a fair opportunity to conduct discovery, present appropriate pre-trial motions, and present full evidence on the issues raised by the amendment. This argument was rejected for two reasons. First, delay alone cannot defeat a Rule 15 motion to amend. *See Bertrand v. Sava,* 535 F.Supp. 1020 (S.D.N.Y.1982). Second, the City had the opportunity, if it so chose, to request additional evidentiary hearing at the time Kollsman's motion for leave to amend was granted pursuant to Rule 15(b). The City made no such request.

■ An additional reason for allowing amendment of Kollsman's complaint lies in the time-honored principle that, whenever possible, controversies should be decided on non-constitutional grounds. *Ashwander v. Valley Authority,* 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688 (1936). The Court concludes that a Rule 15(b) amendment to conform to the evidence was proper.

**B. *Exhaustion of Administrative Remedies***

While not a matter of jurisdiction of the subject matter, there are situations which require exhaustion of administrative remedies as a prerequisite to the availability of judicial relief. The facts which support relief under Count VII require a discussion of this subject.

As initially noted, Plaintiff, Kollsman, is a citizen of the State of New York, and the Defendant, the City of Los Angeles, is a California municipal corporation. Diversity

jurisdiction is accordingly conferred pursuant to 28 U.S.C. § 1331. The record indicates, however, that under the Los Angeles Municipal Code, Kollsman was entitled to appeal the City's disapproval of his tract application to the City Planning Commission, but elected not to do so. Instead, both parties, pursuant to a stipulation dated December 11, 1979, agreed to suspend the running of the time for the filing of an administrative appeal, pending the outcome of this case. The stipulation states in pertinent part that "the aforesaid stipulation shall not affect the ability of either party to raise issues of fact and law in any phase of the instant action."

■ It is axiomatic that the subject matter jurisdiction of the federal court may not be conferred by consent of the parties. *California v. La Rue,* 409 U.S. 109, 111, n. 3, 93 S.Ct. 390, 394, n. 3, 34 L.Ed.2d 342 (1972). Exhaustion of administrative remedies, however, is not a federal jurisdictional requirement, but a "prudential consideration." *Steere Tank Lines, Inc. v. ICC* 675 F.2d 763, n. 5 (5th Cir.1982). When not mandated by federal statute, the requirement that a plaintiff exhaust available administrative remedies prior to filing a claim for relief in federal court may be waived by the defendant. *Holloway v. Gunnell,* 685 F.2d 150, 152, n. 2 (5th Cir.1982). In the instant case, the City waived the exhaustion requirement by signing the stipulation of December 11, 1979.

There have been few cases which interpret the California code sections which are involved in this case and little likelihood that the future will bring State Court decisions on applications which were filed prior to January 1, 1978 and remain undetermined. In this respect, the Kollsman case may be unique. At least the possibility of additions to the species has long been extinct. So where statutes may require interpretations, it is necessary for this court to proceed.

C. *Completeness of the Kollsman Application.*

California Government Code Sections 65920 *et seq.,*[10] which became effective in 1978 while this case was pending, were intended by the California Legislature to "streamline the permit process for development projects." Sahm, *Project Approval, supra* at 588. Cal.Gov.Code Section 65921 provides:

The Legislature finds and declares that there is a statewide need to ensure a clear understanding of the specific requirements which must be met in connection with the approval of development projects and to expedite decisions on such projects. Consequently, the provisions of this chapter shall be applicable to all public agencies, including charter cities.

When read in conjunction with the provisions of the California Environmental Quality Act, Cal.Pub. Resources § 21000 *et seq.,* the Development Act represents a comprehensive statutory scheme for the regulation of development application processing by local agencies.[11]

Included in the prescribed development application procedures is an environmental review process which analyzes the impact of the proposed development on the environment.[12] To further streamline the permit process for development projects, the Legislature found it necessary to expedite decisions on such projects by establishing deadlines for phases of the permit process. For failure to meet the deadlines, the Legislature provided that the applications would be deemed complete or the project approved.

Section 65924 of the Government Code states in pertinent part that "[w]ith respect

**10.** Sometimes referred to as the Development Act.

**11.** Section 65930 defines "local agency" as "any public agency other than a state agency." Section 65932 defines "public agency" as any state agency, any county, city and county, city,

regional agency, public district, redevelopment agency, or other political subdivision." Under the definition of these terms, the City is clearly a "local agency" within the meaning of the Development Act.

**12.** *See* note 2 and accompanying text.

to such application received prior to January 1, 1978, but not determined to be complete as of that date, determination that the application is complete or incomplete shall be made no later than 60 days after the effective date of the act amending this section in 1978." Since the Kollsman tract application, which was submitted on January 12, 1977, had not been determined to be complete or incomplete as of January 1, 1978, the City was required, under Section 65924, to make that determination not later than 60 days after September 26, 1978, the effective date of the statute.

 In a document dated November 22, 1978, Kollsman was informed by the City that his development application had been determined to be incomplete. While this document was transmitted within the 60 day time constraint of Section 65924, it was not a document which conformed to statute and was therefore not legally sufficient to constitute the determination required by law. It was not based on a determination which the Development Act seeks to effectuate. This subject is further discussed below.

Section 65940 of the Government Code requires the State of California to compile and make available one or more lists which specify in detail the information required from any development project applicant.[13]

Section 65941 requires that the information to be compiled pursuant to Section 65940 include the criteria which the City applies in order to determine the completeness of any application.[14] As of November 22, 1978, or at the very latest, January 12, 1979,[15] the only information missing from the Kollsman tract application according to the list proposed by the City, was a "full EIR", which the City maintained should include discussion of slope density and cluster project alternatives.

As noted above, it was the duty of the City to prepare the "full EIR." Under Section 65941, the City may not lawfully require Kollsman to submit "the informational equivalent of an environmental impact report" as part of a complete development application,[16] although it may require "sufficient information to permit the agency to make the determination required by Section 21081.1 of the Public Resources Code."[17]

Assuming *arguendo* that Kollsman did not submit the informational equivalent of an EIR, Cal.Gov.Code Section 65941 prohibits the City from declaring the Kollsman application incomplete on that basis. It is clear from a preponderance of the evidence, however, that not only did Kollsman submit information sufficient to enable the City to determine whether an EIR or negative declaration should be made, but he also sub-

---

**13.** Section 65940 provides: "Not later than June 30, 1978, each state agency shall compile one or more lists which shall specify in detail the information which will be required from any applicant for a development project. Copies of such information shall be made available to all applicants for development projects and to any person who requests such information."

**14.** Section 65941 provides: "[t]he information compiled pursuant to Section 65940 shall also indicate the criteria which such agency will apply in order to determine the completeness of any application submitted to it for a development project.

**15.** The document dated January 12, 1979 indicates that only environmental clearance was required before the City could schedule a public hearing regarding approval of the Kollsman tract application.

**16.** The amendment to Section 65941, effective September 26, 1978, provides that "[i]n the event that a public agency is a lead agency for

purposes of Division 13 (commencing with Section 21000) of the Public Resources Code, such criteria shall not require the applicant to submit the informational equivalent of an environmental impact report as part of a complete application; provided, however, that such criteria may require sufficient information to permit the agency to make the determination required by Section 21080.1 of the Public Resources Code."

**17.** Cal.Pub.Resources Code § 21080.1 provides in pertinent part that "[t]he lead agency shall have the responsibility for determining whether an environmental impact report or a negative declaration shall be required for any project subject to the provisions of this division." A negative declaration is a declaration that there is no environmental impact and that an EIR is not required. See Cal.Pub. Resources Code § 21064.

mitted information sufficient to enable the City to draft a legally adequate EIR.

A certified copy of the City's guidelines for the implementation of the California Environmental Quality Act of 1970 provides in Article VI, § i(7):

7. *The Final EIR*

 a. *Contents of the Final EIR.*

 The final EIR shall be prepared by the Lead City Agency and shall consist of the following:

 (1) The Draft EIR;

 (2) A list of persons, organizations, and public agencies commenting on the Draft EIR;

 (3) The comments and suggestions received on the Draft EIR, verbatim or in summary;

 (4) The responses of the Lead City Agency to significant environmental points raised in the review and consultation process;

 (5) A brief summary of the significant information contained in the EIR; and

 (6) A certification prepared by the Lead City Agency pursuant to subsection 2 of this section.

Although he was not legally required to, Kollsman submitted to the City the informational equivalent of an EIR. As can be observed from the City's own guidelines stated above, the only steps remaining for completion of a final EIR were to be taken by the City.

Section 21002 of the Pub.Resources Code,[18] and the cases interpreting CEQA, make it clear that a legally adequate EIR need not discuss *all* alternatives, but merely reasonable, or feasible[19] alternatives. In *Foundation for San Francisco's Architectural Heritage v. City and County of San Francisco,* 106 Cal.App.3d 893, 165 Cal.Rptr. 401 (1980), the court held that:

[a]n EIR must describe all reasonable alternatives to the project (Pub.Resources Code § 21061), including those capable of reducing or eliminating environmental effects; the specific alternatives of "no project" must also be evaluated (Pub.Resources Code, §§ 21002, 21100; Guidelines, Cal.Admin.Code, tit. 14, § 15143, subd. (d)). The discussion of alternatives need not be exhaustive and the requirement as to the discussion of alternatives is subject to a construction of reasonableness. The statute does not demand what is not realistically possible, given the limitation of time, energy, and funds. 'Crystal ball' inquiry is not required.

The statutory requirements for consideration of alternatives must be judged against a rule of reason. There is no need for the EIR to consider an alternative whose effect cannot be reasonably ascertained and whose implementation is deemed remote and speculative.

106 Cal.App.3d at 910, 165 Cal.Rptr. at 410 (citations omitted).

In the instant case, Kollsman and his engineers made outstanding efforts to supply the City with information sufficient to allow the City to produce a legally adequate EIR. Kollsman submitted a first draft EIR on July 18, 1977. This EIR draft discussed the statutorily mandated "no project" alternative and two alternative projects.[20] On

---

**18.** Cal.Pub.Resources Code § 21002 provides in pertinent part that "[t]he Legislature finds and declares that it is the policy of the state that public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects, and that the procedures required by this division are intended to assist public agencies in substantially identifying both the significant effects of proposed projects and the feasible alternatives or feasible mitigation measures which will avoid or substantially lessen such significant effects."

**19.** Cal.Pub.Resources Code § 21061.1 defines the term "feasible" as "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social and technological factors."

**20.** The alternative projects discussed were a 42–43–*lot* subdivision and an 85–*lot* subdivision. Kollsman's engineers concluded that "[t]o develop the property at RE 15–1–H, its current zoning, would permit the construction of up to 247 dwelling units, and would adversely impact the character of the surrounding community."

September 15, 1977, Kollsman submitted a second draft EIR which the City circulated among members of local homeowners' associations. At the City's request, Kollsman submitted further information on March 3, 1978, which included radius and topographical maps, blue prints, a summary of the existing flora on the site, and grading information.

The City's response to the efforts of Kollsman and his engineers in obtaining and submitting this environmental and engineering information has been and continues to be that the information provided is inadequate to enable the City to complete a draft EIR. Specifically, a letter to Kollsman's engineer from the Environmental Review Committee, dated May 11, 1978 states:

> A discussion of the impact of the slope density formula and an analysis of alternatives to the proposed project (Item 5), both critical to the completion of the EIR, are still outstanding.
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> Until this information is provided by your office, I am unable to complete a Draft EIR suitable for public circulation.

At the very least, this statement is incredible. By September 13, 1977, the City had already circulated Kollsman's second draft EIR to the local homeowners' associations. Moreover, the standards for a legally adequate EIR, as articulated in *Architectural Heritage, supra,* do not require the City to discuss the impact of the slope-density formula on the Kollsman property, for three reasons. First, CEQA does not require the discussion of project alternatives to be exhaustive. Second, only those alternatives whose effects are reasonably ascertainable, and whose implementation is not remote and speculative, need be discussed. The testimony presented at trial indicates that implementation of the slope-density formula to the Kollsman property, or any property for that matter, would have had effects not reasonably ascertainable, since even the City's Planning Officers could not consistently apply the formula. The number of lots allowed by the formula is entirely dependent upon the method of calculation employed,[21] which may be arbitrarily selected at the discretion of City Planning Officials.[22] Since CEQA would not have required such an arcane discussion in a draft EIR, the City may not require Kollsman to provide such a discussion as part of a complete application.[23]

Third, CEQA requires only discussion of "feasible" alternatives. As defined in CEQA, "feasible" means "capable of being accomplished in a successful manner within

---

21. For example, depending on the method of calculation used, Kollsman would be permitted to divide his 85 acres into either a maximum of 9 building lots, or a maximum of 4 building lots.

22. Whether the slope-density formula is so vague and arbitrary as to constitute a violation of some provision of the United States Constitution is a question that need not be decided today.

23. Furthermore, it is unclear why the City should require the developer to discuss the implementation of the formula to the developer's property, when the City has all the necessary information to make the assessment itself. The City enacted an ordinance which limits development of property by a novel and abstruse mathematical formula. Since the City is responsible for creation of the formula, it should know best how it is to be interpreted and applied. The City could have discussed it in the EIR if it chose to do so.

The City argues that without a discussion of the application of the slope density formula to the subject property, which the City insists Kollsman was required to submit, it could not complete a legally adequate EIR and proceed with the processing of Kollsman's application. This argument is patently frivolous and was contradicted by the City's own witness, Mr. Gary Morris, a Deputy Advisory Agency in the City's Planning Department. In a hearing conducted on April 22, 1981, the following colloquy took place between the court and Mr. Morris:

THE COURT: I think that the testimony in this case has indicated that they apply slope-density formula, and that limits the number of units that can be built on the site. That doesn't have anything to do with the environmental impact or anything, and it is an immutable figure which can't be exceeded. Do you subscribe to that?

THE WITNESS: Yes, I do.

a reasonable period of time, taking into account economic, environmental, social, and technological factors." Cal.Pub. Resources Code § 21061.1. Development of the Kollsman property according to the slope density formula would not have been economically feasible. This was obvious to the City from Kollsman's discussion of reducing the number of units as an alternative. Accordingly, no independent or further discussion of it was required.

■ An overwhelming preponderance of the evidence establishes that by November 22, 1978, Kollsman provided the City with sufficient environmental, engineering, and geological information to enable the City to prepare a legally adequate EIR. Since Kollsman had provided the information necessary from completion of an EIR by the City, the City could not in good faith refuse to accept the Kollsman application as complete on the grounds that it could not prepare an adequate EIR. The action of the City in refusing to certify the Kollsman application as complete was contrary to the policies expressed in the Development Act and CEQA, is ineffective and, as will be further shown, should be disregarded.

It has been pointed out that the Legislature intended to provide a comprehensive plan for the expedition of processing applications for development. It is certain that this intention was that in the means of expedition of processing, all applications should be treated alike. In this respect the Legislature inadvertently overlooked reference to applications initiated prior to January 1, 1978. That this was inadvertent is evidenced by the fact that there is no substantive reason for differentiation. In this context it is important to remember that the Kollsman application was initiated on January 12, 1977 by submitting a Tentative Tract Map to the City Planning Department and that it was in the same year, 1977, that in Cal.Gov.Code § 65921 the Legislature found and declared that a need existed for specific requirements for the approval of development projects and to expedite decisions on such projects. The resulting comprehensive remedial legisla-

tion is a reflection of long existing abuses of administrative processes. Applications which have been long pending represent the greatest need for expedition. It is beyond speculation that the legislation enacted in 1977, 1978, and 1979 to expedite development applications was and is intended to apply to all applications, those initiated before January 1, 1978.

As already mentioned, the statutes which comprise Chapter 4.5 of the Cal.Gov.Code were enacted in 1977. Those provisions regarding land development applications filed prior to January 1, 1978 and not determined to be complete did not identify a date from which statutory deadlines for official action could be measured. In 1978, the legislature adopted an amendment to Section 65924, a part of Article 1, to rectify this omission. The amendment provided: "with respect to such application received prior to January 1, 1978, but not determined to be complete as of that date, a determination that the application is complete or incomplete should be made not later than 60 days after the effective date of the act amending this section in 1978." The effective date of this amendment was September 26, 1978. The Kollsman application fell into the category described in the amendment. This amendment of the 1977 legislation is a reaffirmation of the legislative intent referred to above.

Section 65943, a part of Article 3 entitled "*Applications for Development Projects: completeness of application; determination; time; specification of parts not complete and manner of completion,*" reads as follows:

Not later than 30 calendar days after any public agency has received an application for a development project, such agency shall determine in writing whether such application is complete and shall immediately transmit such determination to the applicant for the development project. *If such written determination is not made within 30 days after receipt of the application, the application shall be deemed complete for purposes of this chapter.* In the event that the applica-

tion is determined not to be complete, the agency's determination shall specify those parts of the application which are incomplete and shall indicate the manner in which they can be made complete."

The emphasis indicates an addition to the statute which was added in 1979, effective October 2, 1979.

The portion of Section 65943 relevant to this discussion is the last sentence, "In the event that the application is determined not to be complete, the agency's determinations shall specify those parts of the application which are incomplete and shall indicate the manner in which they can be made complete."

The court concludes that wherever in Chapter 4.5 of the Government Code a determination of incompleteness is made, the contents of the determination is governed by Section 65943 in that "the agency's determination shall specify those parts of the application which are incomplete and shall indicate the manner in which they can be made complete."

The written determination of incompleteness made by the City and transmitted to Kollsman does not comply with the letter or the substance of the statutory requirements. It is defective and inadequate to accomplish the statutory purpose. It is no more than a title without substance, an empty shell, which does not attempt to conform to the legislative purpose which, as the court sees it, is an instruction to the City to be helpful by being specific, not only in the respects which the City considers the application incomplete but in addition thereto telling him exactly what he might do to make it complete. As a consequence, the document sent to Kollsman on November 22, 1978 entitled "Determination of Incompleteness of Application" is ineffective as the document required by Section 65924 in light of the provisions of the last sentence of Section 65943 and that the document should be disregarded.

As previously pointed out, there was nothing to compel the City to make a determination as to the completeness or incompleteness of an application until 60 days after September 26, 1978 when Cal.Gov. Code § 65924 became effective. Even though as early as May 12, 1978, it was apparent to the City that Kollsman knew of no environmental information or engineering information or other information which the City could lawfully require an applicant to furnish, the City made no determination as to completeness or incompleteness. On the contrary, the City suspended processing the application. After the effective date of Section 65924, this posture did not change despite amendment to Section 65941 providing that the informational equivalent of an EIR could not be required. The document of November 22, 1979 shows that at that time, the City was still asserting a lack of the informational equivalent of an EIR. The court concludes that the City did not proceed to make a bona fide determination of completeness or incompleteness at any time prior to November 22, 1978.

 The City was familiar with the statutory provisions. The insufficiency of the notice given indicates that the City had no intention to actually specify any particulars in which the application could be said to be incomplete because there was no additional information which could be lawfully required.

It was the intent of the legislature that in the event of failure to meet the substantive requirements prescribed in Section 65943 within the time limits, the application should be deemed complete. Further, the court finds as a fact that the information which could legally be required by the City was supplied to the City and the application was in fact complete. The court concludes that in all respects the application must be deemed complete for the purposes of Cal. Gov.Code Chapter 4.5 and deemed accepted as complete as of November 22, 1978.

D. *Approval of the Kollsman Application.*

Section 65950 of the Government Code provides in pertinent part: "Any public agency which is the lead agency for a development project shall approve or disapprove such project within one year from the date

on which an application requesting approval of such project has been received and accepted as complete by such agency." Section 65956(a) provides that "[i]n the event that a lead agency or a responsible agency fails to act to approve or to disapprove a development project within the time limits required by this article, such failure to act shall be deemed approval of the development .project." Under .Sections 65950 and 65956, the City was required to approve or disapprove the Kollsman application within one year of the date it became complete, November 22, 1978.

The law provides that the time limits for action on applications are maximum time limits and that public agencies shall, if possible, approve or disapprove development projects in ·shorter. periods of time. Cal. Gov.Code § 65953. That it could have been and should have been found complete long before the expiration of 60 days from September 26, 1978 has been discussed. The City anticipated the expiration of the 60 day time limit for determining that the application was complete or incomplete by 3 days. However, in near total disregard of Section 65953, the City's action on processing applications was limited to compliance with maximum time limits as calculated by the City. This calculation of the maximum time limit to approve or disapprove a development project as required by Section 65956 was calculated as being 60 days from the effective .date of Section 65924, September 26, 1978, plus one year, or November 26, 1979.

Adhering to this method of calculation, it was by letter dated November 26, 1979 that the City advised Kollsman that his development application was disapproved for lack of completeness. However, the action as to a determination of completeness or incompleteness of an application was taken by the City on November 22, 1978. Since the court has ruled that this action is to be taken as accepted as complete, the maximum time limit prescribed by Section 65950 expired one year from November 22, 1978 and the action taken by the City on November 26, 1979, was in excess of the one year time limit. The City failed to act to approve or disapprove the Kollsman development project within the time limit of Section 65956 and it is therefore deemed approved as provided in Section 65956.

The notice of November 14, 1979 reads like a stroke of conscience. The Kollsman tract number and the application's filing date were noted. It indicates that the one-year deadline for approval or disapproval of the project was approaching and that the City intended to disapprove the project on November 21, 1979, one day before expiration of the deadline. But the deadline passed before the disapproval which was ·not forthcoming until November 26, 1979. The notice of November 14, 1979 reflects an awareness that the Kollsman application was complete in fact on November 22, 1978. In this case, the consequences of missing the deadline are just.

It is found and determined that there is no just reason for delay in the entry of judgment on this claim. Judgment on Count VII should be entered as a final judgment on this claim.

Plaintiff is entitled to judgment that his development project, which is identified by reference to Tentative Tract Map 33300, should be deemed approved subject to timely determination of ordinary and reasonable conditions to the recordation of a final tract map as otherwise provided by law.